

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-1995

# Eichenholtz v Brennan

Precedential or Non-Precedential:

Docket 94-5253

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Eichenholtz v Brennan" (1995). *1995 Decisions*. Paper 85.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/85

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-5253


PAULETTE EICHENHOLTZ, Individually and on behalf of all others
similarly situated and Derivatively on behalf of INTERNATIONAL
BREEDERS, INC., and DAVID W. CRAIG, (Intervenor in D.C.)

v.

ROBERT E. BRENNAN; FIRST JERSEY SECURITIES, INC.; INTERNATIONAL
THOROUGHBRED BREEDERS, INC.; GARDEN STATE RACETRACK, INC.; ROONEY
PACE, INC.; FIRST PHILADELPHIA CORPORATION; KERRY B. FITZPATRICK;
JOHN W. ALLEN; JOSEPH C. DANIEL, JR.; JACK PRICE; ROBERT J.
QUIGLEY; NORMAN ROTHSTEIN; JOHN J. DEGNAN; RICHARD J. HUGHES;
RONALD J. RICCIO; JOSEPH K. FISHER; and HERBERT BARNESS

(Newark New Jersey District Court Docket No. 88-cv-00515)

LARRY SALBERG, Individually and on behalf of all others similarly
situated and DAVID W. CRAIG, (Intervenor in D.C.)

v.

ROBERT E. BRENNAN; FIRST JERSEY SECURITIES, INC.; INTERNATIONAL
THOROUGHBRED BREEDERS, INC.; ROONEY PACE, INC.; KERRY B.
FITZPATRICK; ROBERT J. QUIGLEY; JOHN J. DEGNAN; RICHARD J.
HUGHES; RONALD J. RICCIO; and JOSEPH K. FISHER

(Newark New Jersey District Court Docket No. 88-cv-00773)


                    FIRST JERSEY SECURITIES, INC.;
                    ROONEY PACE, INC.; and FIRST
                    PHILADELPHIA CORPORATION,
                                        Appellants.


Appeal from the United States District Court
for the District of New Jersey

D.C. Civil Action Nos. 88-cv-00515 & 88-cv-00773


Argued December 1, 1994

Before: HUTCHINSON, NYGAARD and SEITZ, <u>Circuit Judges</u>.

Filed:  March 27, 1995

Paul J. Linker, Esquire (Argued)
Donna M. Hughes, Esquire
Robinson, St. John & Wayne
Two Penn Plaza East
Newark, New Jersey 07104

 <u>Attorneys for Appellants</u>

Paul D. Wexler, Esquire (Argued)
Raymond A. Bragar, Esquire
Bragar & Wexler, P.C.
900 Third Avenue
New York, New York 10022

Glenn F. Ostrager, Esquire
Ostrager, Chong & Flaherty, P.C.
300 Park Avenue
New York, New York 10022
(Attorneys for Plaintiffs)

Frederick B. Lacey, Esquire (Argued)
Jay G. Safer, Esquire
LeBoeuf, Lamb, Greene & MacRae
One Riverfront Plaza
Newark, New Jersey 07102
(Attorneys for Individual Settling Defendants)

Leonard Barrack, Esquire
Sheldon L. Albert, Esquire
Jeffrey W. Golan, Esquire (Argued)
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
(Attorneys for International Thoroughbred Breeders, Inc.)

 <u>Attorneys for Appellees</u>


**OPINION OF THE COURT**

**SEITZ, _Circuit Judge_.**

This is an appeal from an order of the district court made final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. In its order, the court approved a settlement with some but not all defendants in a securities action. The non-settling defendants appeal, arguing that the partial settlement was unfair and prejudicial to them. The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review the district court's order for an abuse of discretion. Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 965 (3d Cir. 1983).

## I. FACTS

International Thoroughbred Breeders ("ITB") is a Delaware corporation in the business of buying, selling, and leasing interests in thoroughbred horses for breeding. In 1977, Garden State Racetrack ("Garden State") burned down. In 1983, ITB proposed a plan to purchase the Garden State grounds, construct a new facility, and operate a thoroughbred and harness racing facility. ITB raised money for this undertaking through the sale of securities. At issue here are four public offerings of securities by ITB.

Plaintiffs Paulette Eichenholtz ("Eichenholtz") and Larry Salberg ("Salberg") sued on behalf of the class of purchasers of ITB securities who were allegedly without knowledge of non-public omissions and material misstatements in ITB's offerings of July

26, 1983; April 16, 1984; July 25, 1985; and May 14, 1986.[1] See generally JA at 485-520 (Plaintiffs' and Intervenor Plaintiffs' Responses to Defendants' First Set of Contention Interrogatories). In addition, plaintiffs sued derivatively on behalf of ITB.

Named as defendants were First Jersey Securities, Inc. ("First Jersey"), Rooney Pace, Inc., and First Philadelphia Corporation ("First Philadelphia"), all registered broker-dealers; ITB, the company that issued the allegedly objectionable securities; Kerry B. Fitzpatrick, Robert J. Quigley, John J. Degnan, Richard J. Hughes, Ronald J. Riccio, Joseph K. Fisher, Herbert Barness, John W. Allen, Joseph C. Daniel, Jack Price, and Norman Rothstein, all past or present members of ITB's Board of Directors; and Robert J. Brennan (collectively, "the individual settling defendants"), the controlling shareholder of both First Jersey and ITB and Chairman of the ITB Board of Directors.[2]

---

[1] The Eichenholtz suit was initially filed in August 1986 in the United States District Court for the Southern District of New York. The Salberg complaint was filed in the District of New Jersey in July 1987. In February 1988, the Eichenholtz complaint was transferred to the District of New Jersey, and it was consolidated with the Salberg complaint. Thereafter, the parties filed an amended complaint. See Joint Appendix at 106-63 ("JA"). Eichenholtz claims to represent the subclass of those who purchased ITB securities in the 1983, 1984, and 1985 offerings, and Salberg claims to represent those who purchased ITB securities in the 1986 offerings.

[2] Garden State Racetrack ("Garden State"), an ITB subsidiary, was named as a defendant in the Eichenholtz Complaint, but not in the consolidated and amended complaint. Garden State remains in the caption in the current appeal, but is not a party.

The essence of the complaint is that the four public offerings were elaborate schemes to generate underwriting fees and to sell ITB securities at an inflated value. Plaintiffs alleged violations of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5; sections 11, 12(2), and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77k,77l(2), 77q(a); and of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

In September 1988, the defendants moved to dismiss the complaint. The district court dismissed part of the complaint, and it left the rest of the complaint substantially intact. See JA at 164.[3] Thereafter, the district court certified the plaintiffs' proposed class pursuant to Federal Rule of Civil Procedure 23, and the class was divided into four subdivisions. See id. at 208-21. Following the court's ruling, the parties began conducting discovery.

Prior to the conclusion of discovery, the parties began discussions at the suggestion of the district court in an effort to facilitate settlement. Settlement conferences were held before a magistrate judge. Following the conferences, the judge ordered the plaintiffs to submit any motions for voluntary

---

[3] The court dismissed all federal securities claims arising out of the 1983 offering, the section 10(b) claim arising from the 1986 offering, the RICO claim arising from the 1986 offering, the factual allegations that the 1984 and 1985 prospectuses failed to disclose that there was no reasonable basis to conclude that Garden State could be operated profitably, and all claims arising under section 17(a) of the 1933 Act. See JA at 164.

dismissal, pursuant to Federal Rule of Civil Procedure 41(a), which were to be accompanied by any purported settlement with or affecting the individual settling defendants. Further, he ordered that, within fourteen days of any determination on the Rule 41(a) motions, the defendants were to file any cross-claims for contribution and indemnification. In turn, ITB, First Jersey, First Philadelphia, and Rooney Pace all filed cross-claims for contribution under the federal securities laws and for common law contribution and indemnification. See id. at 340, 943, 962, and 978. Additionally, First Jersey filed a cross-claim for contractual indemnity, pursuant to a series of private indemnity contracts between it and ITB. Id. at 946-49.

As a result, the plaintiff class submitted a motion for voluntary discontinuance of the derivative claims against the individual settling defendants and a proposed partial settlement agreement ("the first agreement") between the plaintiff class, the individual settling defendants,[4] and National Union Fire Insurance Company ("National Union").[5] National Union is the insurer of the individual settling defendants, but does not insure ITB. See id. at 227.

### A. The First Settlement Agreement

The first agreement, see JA at 235-58, provided for the release of all claims against the individual settling defendants to the extent of their insured interest and the discontinuance of

---

[4] The first agreement indicates that Brennan was included only in his capacity as a director and officer of ITB. See JA at 235.

[5] National Union was not a defendant in this action.

the derivative claims.  In return, National Union would immediately pay the class $3.125 million.  The class would pursue its claims against First Jersey, Brennan (in his uninsured capacity), First Philadelphia, and ITB. (the "non-settling defendants").[6]  Moreover, the first agreement provided that, "[t]o the extent that the class does not recover all or part of an additional $4.375 million from the non-settling defendants, National Union would pay all or part of this sum to the class with a cap of $7.5 million." See id. at 228 (Wexler Affidavit at ¶ 7).  If the class later settled with the non-settling defendants and the amount of that settlement fell below $4.125 million, National Union's consent to the settlement would be required.  National Union agreed not to unreasonably withhold that consent. See id. at 243.

In addition, the proposed settlement included a provision whereby the district court, in giving its approval, would order "that all claims for contribution or indemnification however denominated, against the settling defendants, based upon liability on any of the settled claims, in favor of persons, including [the] non-settling defendants are extinguished, discharged, satisfied and/or otherwise barred and unenforceable." Id. at 249 (the "bar order").

ITB strongly objected to the first settlement agreement. First, ITB argued that any settlement by its fiduciaries, the individual settling defendants, that did not include ITB but did

---

[6]  At that time, Rooney Pace, which is now a non-settling defendant, was in bankruptcy.

include a bar order necessarily required its fiduciaries to breach their obligations to ITB. Second, ITB claimed that the plaintiff class lacked standing to voluntarily withdraw the derivative action without providing any consideration to ITB. ITB reasoned that, as the derivative action belonged to the corporation and not the shareholders, the shareholders were in no position to withdraw the claim. Accordingly, with the assistance of the district court, the first agreement was revised by the parties. ("proposed final agreement").

## B. Proposed Final Agreement

The proposed final agreement included the addition of ITB as a settling defendant and a statement that ITB consented to the withdrawal of the derivative claim. In addition, ITB paid the sum of $250,000 to the plaintiff class, and it has agreed to pay an additional $150,000, if, and when, that amount is received by ITB pursuant to a contract ITB entered into for the sale of a mortgage note on Philadelphia Park, its former subsidiary.

The proposed final agreement also expressly barred the plaintiffs "from seeking from the non-settling defendants any amounts greater than the proportionate liability, if any, of the non-settling defendants for any damages, if any, determined at trial . . . ." JA at 1308 ("proportionate fault judgment reduction provision"). The bar order and the provision requiring National Union's consent to a settlement below $4.375 million, as they had been presented in the first agreement, remained intact.

## C. The District Court Proceedings

The district court granted the plaintiffs' Rule 41(a) motion and preliminarily approved the proposed final agreement. Notice was then given to the class in compliance with Federal Rule of Civil Procedure 23, and the court held a hearing on the proposed final agreement. The non-settling defendants were the only parties who opposed the partial settlement. On April 11, 1994, the court entered judgment made final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure and formally approved the proposed final agreement ("partial settlement").[7] The court concluded that the partial settlement is "fair, reasonable and adequate, is in the best interests of the Class and ITB and should be and is hereby approved . . . ." JA at 1540.

The non-settling defendants Rooney Pace, First Jersey, and First Philadelphia ("non-settling defendants") filed a timely notice of appeal. Non-settling defendant Brennan is not a party to this appeal. The non-settling defendants contend that the district court abused its discretion in approving the partial settlement.

## II. DISCUSSION

---

[7] On August 31, 1994, the district court filed an additional memorandum in support of its earlier decision approving the partial settlement. Appellees made a motion to expand the appellate record pursuant to Federal Rule of Appellate Procedure 10(e) to include the August 31, 1994 memorandum. The non-settling defendants opposed; however, on November 8, 1994, we granted appellees motion to expand the record. In its memorandum, the court explains the appropriateness and fairness of the bar order and the proportionate judgment reduction provision.

Generally, the approval of a class action settlement is committed to the sound discretion of the district court. It can endorse a settlement only if the compromise is "fair, adequate, and reasonable." Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 965 (3d Cir. 1983); see In re Masters Mates & Pilots Pension Plan, 957 F.2d 1020, 1026 (2d Cir. 1992). Where the rights of third parties are affected, it is not enough to evaluate the fairness of the settlement to the settling parties; the interests of such third parties must be considered. See id.

In the present case, the plaintiffs, ITB, and the individual settling defendants (collectively "appellees") argue that the non-settling defendants, as non-parties to the agreement, lack standing to object to the partial settlement. We turn to that issue.

## A. Standing

Non-settling defendants, in general, lack standing to object to a partial settlement, because they are ordinarily not affected by such a settlement. See In re School Asbestos Litig., 921 F.2d 1330, 1332 (3d Cir. 1990), cert. denied, 499 U.S. 976 (1991); see also Zupnick v. Fogel, 989 F.2d 93, 98 (2d Cir.), cert. denied, 114 S. Ct. 384 (1993); Waller v. Financial Corp. of America, 828 F.2d 579, 582-83 (9th Cir. 1987). There is, however, a recognized exception to this general rule, which permits non-settling defendants to object to a partial settlement where they can demonstrate that they will suffer some formal legal prejudice as a result of the partial settlement. Zupnick, 989 F.2d at 98; In re School Asbestos Litig., 921 F.2d at 1332.

"There is consensus that a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example," or to invalidate its contract rights. Waller, 828 F.2d at 583 (citations omitted); see In re School Asbestos Litig., 921 F.2d at 1332.

Here, the non-settling defendants argue that their rights to indemnification and contribution, and First Jersey's contractual right to indemnification from ITB, have been extinguished by the bar order imposed by the district court pursuant to the partial settlement. See JA at 1302 (partial settlement at ¶ 2(a)), 1307 (partial settlement at ¶ 3(b)), 1543 (district court's order approving the partial settlement).[8] As a result, the non-settling defendants claim that they have suffered a cognizable prejudice by the approval of the partial settlement.

_____

[8] In approving the partial settlement, the district court imposed the following bar order:

> 4   (a)  Each of the Non-Settling Defendants, each of the Settling Defendants, and any other Person who may assert a claim against the Settling Defendants based upon, relating to, or arising out of the Settled Claims, the Action or the settlement of this Action, are permanently barred, enjoined and restrained permanently from commencing, prosecuting, or asserting any such claim or claims for contribution or indemnity or otherwise denominated, against the Settling Defendants, as claims, cross-claims, counterclaims, or third-party claims in the Action or in any other court, arbitration, administrative agency or forum, or in any other manner, including but not limited to offset.  All such claims are hereby extinguished, discharged, satisfied and unenforceable.

JA at 1543.

We conclude that the non-settling defendants fall within the recognized exception and have standing to object to the partial settlement. We now address the merits of the objections made by the non-settling defendants.

## B. The Fairness of the Partial Settlement
## to the Non-settling Defendants

The non-settling defendants first argue that the inclusion of the bar order renders the partial settlement unfair and prejudicial to them.

### 1. The Bar Order

The non-settling defendants claim that the bar order extinguishes their right to seek contribution and indemnification from the settling defendants. They argue that their right to contribution lies in the federal securities laws and in the common law, and their right to indemnification lies in the federal securities laws, the common law, and, as to First Jersey, in its underwriting agreements with ITB.

### i. The Right to Contribution and Indemnification

#### a) Federal Securities Laws

The court agrees with the non-settling defendants that under section 11 of the Securities Act of 1933 (the "1933 Act"), they have an express right to seek contribution for liability under that section. See 15 U.S.C. § 77(f); see also In re Jiffy Lube Sec. Litig., 927 F.2d 155, 160 (4th Cir. 1991). Although there is no express right to seek contribution under section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"),

see 15 U.S.C. § 78(b), and Securities Exchange Act Rule 10b-5, see 17 C.F.R. § 240.10b-5, the Supreme Court has implied a right to seek contribution under both provisions. See Central Bank, N.A. v. First Interstate Bank, N.A., 114 S. Ct. 1439, 1448-49 (1994); Musick, Peeler & Garrett v. Employers Ins., 113 S. Ct. 2085, 2091 (1993); see also TBG, Inc. v. Bendis, 36 F.3d 916, 923 (10th Cir. 1994) (contribution under Rule 10b-5); Alvarado Partners, L.P. v. Mehta, 723 F. Supp. 540, 549 (D. Colo. 1989) (contribution under section 10(b)); Seiler v. E.F. Hutton & Co., 102 F.R.D. 880, 885-86 (D.N.J. 1984) (contribution under section 10(b) and rule 10b-5).

However, there is no express right to indemnification under the 1933 or 1934 Acts. Further, those courts that have addressed the issue have concluded that there is no implied right to indemnification under the federal securities laws. See First Golden Bancorporation v. Weiszmann, 942 F.2d 726, 728 (10th Cir. 1991); Riverhead Sav. Bank v. National Mortgage Equity Corp., 893 F.2d 1109, 1116 (9th Cir. 1990); Baker, Watts & Co. v. Miles & Stockbridge, 876 F.2d 1101, 1104-05 (4th Cir. 1989) (holding that there is no right to indemnification under section 12(2)); King v. Gibbs, 876 F.2d 1275, 1281 (7th Cir. 1989); Alvarado Partners, L.P., 723 F. Supp. at 549 (stating that there is no right to indemnification under sections 11 or 10(b)); Seiler, 102 F.R.D. at 885. This circuit has not yet addressed this issue.

As will be explained below, indemnification runs counter to the policies underlying the 1933 and 1934 Acts. In addition, there is no indication that Congress intended that

indemnification be available under the Acts. See Baker, Watts & Co., 876 F.2d at 1105; King, 876 F.2d at 1281. In drafting the Acts, Congress was not concerned with protecting the underwriters, but rather it sought to protect investors. Here, it is the underwriters, not the victims, who seek indemnification. We agree with those courts that have held that there is no implied right to seek indemnification under the federal securities laws.

In addition, in support of its right to seek indemnification from ITB, First Jersey relies on its underwriting agreements with ITB.[9]

### b) First Jersey's Contractual Right to Indemnification

Each of four separate underwriting agreements between ITB and First Jersey contains provisions for indemnification. In these provisions, ITB agreed to indemnify First Jersey from any and all loss, liability, claims, damage, and expense arising from

---

[9] The non-settling defendants also argue that they have common law rights to contribution and indemnification. They claim that the two common law theories of liability asserted against them preserve their rights to indemnification and contribution. The claims are: 1) respondeat superior, seeking to hold First Jersey liable for the actions of individual non-settling defendant Brennan (the majority shareholder of First Jersey); and 2) the commission of waste and breach of fiduciary duty alleged in the Ninth Claim of the Consolidated Amended Complaint asserting a derivative claim for ITB.

These arguments are without merit. First, Brennan, in his uninsured capacity, is a non-settling defendant. Therefore, First Jersey's indemnification and contribution claims against Brennan would not be barred by the partial settlement. Second, the Ninth Claim has been dismissed as part of the partial settlement.

any material misstatement, untrue statement, or omission in the public offering. See JA at 1133, 1154, 1174, 1195.

Generally, federal courts disallow claims for indemnification because such claims run counter to the policies underlying the federal securities acts. See, e.g., In re U.S. Oil and Gas Litig., 967 F.2d 489, 495 (11th Cir. 1992); Baker, Watts & Co., 876 F.2d at 1104-05; Globus v. Law Research Service, Inc., 418 F.2d 1276, 1288-89 (2d Cir. 1969), cert. denied, 397 U.S. 913 (1970). The underlying goal of securities legislation is encouraging diligence and discouraging negligence in securities transactions. See Baker, Watts & Co., 876 F.2d at 1105 (citing Laventhol, Krekstein, Horwath & Horwath v. Horwitch, 637 F.2d 672, 676 (9th Cir. 1980), cert. denied, 452 U.S. 963 (1981)); Franklin v. Kaypro Corp., 884 F.2d 1222, 1227 (9th Cir. 1989), cert. denied, 498 U.S. 890 (1990); Globus, 418 F.2d at 1288-89. These goals are accomplished "by exposing issuers and underwriters to the substantial hazard of liability for compensatory damages." Id. at 1289.

The non-settling defendants argue that the policy of not enforcing indemnification provisions should not apply in cases, as here, where an underwriter was merely negligent, played a "de minimis" role in the public offering at issue, or was being held derivatively or vicariously liable. Non-settling Defendants' Br. at 28 (quoting Globus, 418 F.2d at 1288).[10] We disagree.

---

[10] The non-settling defendants' argument would obviously not apply to the section 10(b) and Rule 10b-5 allegations, because those provisions require more than "ordinary negligence"

A number of federal courts have held that this policy against allowing indemnification extends to violations of sections 11 and 12(2), where the underwriter is merely negligent in the performance of its duties. See LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 4632 & n.428 (3d ed. 1988) (citing negligence cases where indemnification was not permitted); see also Baker, Watts & Co., 876 F.2d at 1105, 1108; Franklin, 884 F.2d at 1227; Globus, 418 F.2d at 1288;[11] Odette v. Sherson, Hammill & Co., Inc., 394 F. Supp. 946, 956-57 (S.D.N.Y. 1975) (disallowing indemnification in a section 12(2) case).  We agree.  The policies underlying the 1933 and 1934 Acts demand that all underwriters be encouraged to fulfill their duties in a public offering, regardless of their role.

---

for liability either as a primary defendant or as an aider and abetter.

[11] Contrary to the non-settling defendants' assertion, it appears that the Globus rationale extends to section 11 violations.  The Second Circuit stated:

> Civil liability under section 11 and similar provisions was designed not so much to compensate the defrauded purchaser as to promote enforcement of the Act and to deter negligence by providing a penalty for those who fail in their duties.  And Congress intended to impose a "high degree of trusteeship" on underwriters.  Thus, what Professor Loss terms the "in terrorem effect" of civil liability might well be thwarted if underwriters were free to pass their liability on to the issuer.  Underwriters who knew they could be indemnified simply by showing that the issuer was "more liable" than they (a process not too difficult when the issuer is inevitably closer to the facts) would have a tendency to be lax in their independent investigation.

Globus, 418 F.2d at 1288 (citations omitted) (footnote omitted); see Helen L. Scott, Resurrecting Indemnification: Contribution Clauses in Underwriting Agreements, 61 N.Y.U. L. REV. 223, 245 (1986).

As stated, the federal securities laws seek, _inter_ _alia_, to encourage underwriters to conduct thorough independent investigations. Unlike contribution, contractual indemnification allows an underwriter to shift its entire liability to the issuer before any allegation of wrongdoing or a determination of fault. As such, indemnification, it is argued, undermines the role of the underwriter as "investigator and public advocate." Scott, _supra_ n.11, at 225.[12] If the court enforced an underwriter indemnification provision, it would effectively eliminate the underwriter's incentive to fulfill its investigative obligation. "The statute would fail to serve the prophylactic purpose that . . . underwriters make some reasonable attempt to verify the data submitted to them." _Id._ at 245.

In addition, if the court were to allow the non-settling defendants to avoid secondary or derivative liability "merely by showing ignorance[, it] would contravene the congressional intent to protect the public, particularly unsophisticated investors, from fraudulent practices." _In re Olympia Brewing Co. Sec._

---

[12] As the Ninth Circuit stated:
The overarching purpose of the Securities Act of 1933, and of the subsequent Exchange Act of 1934, was to restore confidence in the market. Confidence was to be restored by forcing the public disclosure of facts sufficient to permit prudent investors to understand the risks assumed when purchasing a security offered for sale to the public. One of the most important changes brought about by the legislation was that it made accountable _all_ parties responsible for public reports.
_Franklin_, 884 F.2d at 1227 (citing H.R. REP. NO. 85, 73d Cong., 1st Sess. 9 (1933)).

Litig., 674 F. Supp 597, 613 (N.D.Ill. 1987).  As for vicarious liability, "[c]ertain employers . . . assume a higher public duty under the securities laws than do other persons, a duty that requires the affirmative exercise of a high standard of supervision." Id. at 613-14 (citing Sharp v. Coppers & Lybrand, 649 F.2d 175, 181-82 (3d Cir. 1981), cert. denied, 455 U.S. 938 (1982)) (other citations omitted).[13]  The public depends upon an underwriter's investigation and opinion, and it relies on such opinions when investing.  Denying claims for indemnification would encourage underwriters to exhibit the degree of reasonable care required by the 1933 and 1934 Acts. See Baker, Watts & Co., 876 F.2d at 1108.

The non-settling defendants also argue that it makes no sense to preserve their sections 11 and 12(2) statutory defenses, of due diligence and due care respectively, while they are deprived of the right to seek indemnification.  This argument lacks merit.

In order to successfully assert a due care or a due diligence defense, an underwriter must prove that it conducted a reasonable investigation and had a reasonable belief that the information relating to an offering was accurate and complete. See LOUIS LOSS, FUNDAMENTALS OF SECURITIES REGULATIONS 894-95, 898-900

---

[13]  First Jersey is being held liable for the conduct of its agent, Brennan.  As such, it argues, that its right to seek indemnification from Brennan should not be barred.  In this case, because Brennan is a non-settling defendant, First Jersey is not barred from seeking indemnification from him.  Therefore, it will be able to recover if it is held vicariously liable for Brennan's conduct.

(1988).  These defenses encourage an underwriter to act reasonably; they are not available to a negligent underwriter. Unlike indemnification, the statutory defenses support the policies of the act.  Underwriters will be more likely to act diligently in an effort to assert the defenses.

We conclude that the underwriter indemnification agreements between First Jersey and ITB run counter to the policies underlying the securities acts.  Although the non-settling defendants had a right to contribution, they did not have a right to indemnification.  Therefore, the district court did not abuse its discretion in barring and extinguishing any causes of action for indemnification.  We turn now to whether the bar order impermissibly impinges on the non-settling defendants' right to contribution.

## ii. Settlement Contribution Bar

In general, the settlement of complex litigation before trial is favored by the federal courts.  However, in multi-party litigation, settlement may be difficult.  Defendants, who are willing to settle, "buy little peace through settlement unless they are assured that they will be protected against co-defendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation." In re U.S. Oil and Gas Litig., 967 F.2d at 494; see In re Jiffy Lube Sec. Litig., 927 F.2d at 160.  In cases involving multiple defendants, a right to contribution inhibits partial settlement.

Therefore, in order to encourage settlement in these cases, modern settlements increasingly incorporate settlement bar orders into partial settlements. "In essence, a bar order constitutes a final discharge of all obligations of the settling defendants and bars any further litigation of claims made by non-settling defendants." Franklin, 884 F.2d at 1225.

Many states have enacted settlement bar statutes, which allow a bar to the right of contribution if the settlement is made in good faith and the non-settling defendants are entitled to a setoff against any judgment ultimately entered against them. By contrast, however, the federal securities statutes do not expressly provide a settlement contribution bar. See In re Sunrise Sec. Litig., 698 F. Supp. 1256, 1257 (E.D. Pa. 1988).

A settlement contribution bar is designed to encourage settlements. On the other hand, the right to contribution under the federal securities laws seeks to promote fairness to defendants and to deter wrongdoing. "The purpose of a settlement contribution bar rule is to `harmonize the equitable objectives of contribution with the encouragement of settlement.'" Alvarado Partners, L.P., 723 F.Supp at 550-51 (quoting First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co., 631 F. Supp. 1029 (S.D.N.Y. 1986)). Therefore, we agree with the federal courts that "have imposed the bar as a matter of federal common law, finding that a fair and equitable settlement bars implied rights of contribution for federal securities claims." In re Jiffy Lube Sec. Litig., 927 F.2d at 160 n.2; see In re Sunrise Sec. Litig., 698 F. Supp. at 1257.

Because the federal securities statutes do not expressly prescribe a settlement contribution bar rule, in structuring the federal common law rule federal courts may either adopt the forum state's statute or fashion a uniform federal rule. See United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979); see also Franklin, 884 F.2d at 1228; In re Sunrise Sec. Litig., 698 F. Supp. at 1257.

The Supreme Court has stated, "Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy `dependant on a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" Kimbell Foods, Inc., 440 U.S. at 728 (quoting United States v. Standard Oil Co., 332 U.S. 301, 310 (1947)).  In cases involving the federal securities laws, we believe that a nationwide federal rule is preferable.[14]

Given our determination favoring uniformity, we next evaluate the particular settlement contribution bar adopted by the district court.

---

[14]  There are sound reasons to adopt a uniform federal rule. First, contribution under the federal securities laws affects substantive federal rights.  Second, the issue is central to a federal regulatory scheme, and, therefore, national uniformity is desirable. Kimbell Foods, 440 U.S. at 728.  Third, adopting a state's rule would lead to disparate results, because some state do not have a settlement bar rule, and other states have different types of bar rules.  Finally, if we adopt state law, we would encourage forum shopping and spawn wasteful litigation over the applicable state law.  We agree with those federal courts that have opted for a nationwide federal settlement bar rule. See, e.g., Franklin, 884 F.2d at 1228–29; Alvarado Partners, L.P., 723 F. Supp. at 551–52; In re Sunrise Sec. Litig., 698 F. Supp. at 1257–58.

In the present case, the district court adopted the proportionate judgment reduction rule. See JA at 1544-45. It concluded that the proportionate judgment reduction is the fairest method, and the non-settling defendants will not be prejudiced by a proportionate fault reduction. See Non-settling Defendants' Supplemental Reply Brief, Addendum, at 16-17. We agree with the determination of the district court.

Under the proportionate judgment reduction method, the jury, in the non-settling defendants' trial, will assess the relative culpability of both settling and non-settling defendants, and the non-settling defendants will pay a commensurate percentage of the judgment.[15] The risk of a "bad" settlement falls on the plaintiffs, who have a financial incentive to make certain that each defendant bears its share of the damages. See In re Jiffy Lube Sec. Litig., 927 F.2d at 160 n.3; In re Sunrise Sec. Litig., 698 F. Supp. at 1258-59. As pointed out by the Ninth Circuit, the proportionate fault rule satisfies the statutory contribution goals of equity, deterrence, and the policy goal of encouraging settlement. See Franklin, 884 F.2d at 1231. The proportionate fault rule is the equivalent of a contribution claim; the non-settling defendants are only responsible for their portion of the liability.[16]

---

[15] The other commonly used setoff methods are the pro tanto method and the pro rata method. See In re Jiffy Lube Sec. Litig., 927 F.2d at 161-62 n.3. Neither method is at issue in the present case.

[16] Recently, in discussing a partial settlement, the United States Supreme Court stated that a proportionate share approach, the proportionate judgment reduction method, adequately protects non-settling defendants' contribution rights. See McDermott, Inc.

We conclude that the district court did not abuse its discretion in imposing the bar order with the proportionate judgment reduction provision.[17]

### 2. Additional Objections

In addition, the non-settling defendants argue that Article IV of the partial settlement is prejudicial. Article IV, paragraph 2(b) provides that National Union, the insurer for the individual settling defendants, will have to consent to any future settlement between the plaintiff class and the non-settling defendants for an amount less than $4.125 million. See JA at 1298. The provision further provides that such consent shall not be unreasonably withheld. See id. The non-settling defendants argue that the district court abused its discretion in approving a partial settlement that gives National Union the power to be final arbiter of any future settlement.

---

v. AmClyde, 114 S. Ct. 1461, 1466 (1994). The Court stated, "Under [the proportionate share] approach, no suits for contribution are permitted, nor are they necessary, because the non-settling defendants pay no more than their share of the judgment." Id. Although McDermott arose in the admiralty context, its rationale is applicable to the present case.

[17] In TBG, Inc. v. Bendis, 36 F.3d 916 (10th Cir. 1994), the Tenth Circuit addressed the issue of settlement bar orders:

> We conclude that orders barring contribution claims are permissible only because a court or jury has or will have properly determined proportionate fault and awarded the equivalent of a contribution claim, not because of the compensatory award alone. Since the court did not decide the settling defendants' proportional fault and order a credit in that amount, the court had no power to bar the non-settling defendants' contribution claim.

Id. at 923.

As stated, the approval of a class action settlement is committed to the sound discretion of the district court. The court will approve the compromise only if it is fair, adequate, and reasonable. See Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 965 (3d Cir. 1983). The partial settlement at issue does not affect the court's power to approve or disapprove any future settlement between the plaintiff class and the non-settling defendants. Essentially, the class plaintiffs have agreed not to present a settlement to the district court without National Union's consent. In essence, this is no different from the plaintiff class rejecting a settlement proposal from the non-settling defendants. In addition, under the settlement, National Union retains an interest in any future settlement, because they may be called upon to pay additional amounts. See JA at 228.[18]

We conclude that the district court did not abuse its discretion in approving a partial settlement that contained the clause in question. National Union is not the final arbiter; it is the district court that will ultimately approve or disapprove any settlement. In addition, National Union is under an obligation not to act unreasonably.

Additionally, the non-settling defendants complain that the partial settlement is unfair and prejudicial because ITB is not provided with any benefit. We conclude that the non-settling

---

[18] Paul Wexler, attorney for the plaintiffs explained, "To the extent that the class does not recover all or part of an additional $4.375 million from the non-settling defendants, National Union would pay all or part of this sum to the class with a cap of $7.5 million." See JA at 228 (Wexler Affidavit at ¶ 7).

defendants lack standing to make this objection. Assuming, arguendo, that the non-settling defendants are correct in their conclusion, they have nowhere argued that they are prejudiced by the dismissal of the Ninth Claim. In fact, the non-settling defendants have received a benefit because the Ninth Claim has been dismissed, with prejudice, against all defendants. See JA at 1541-42.

We conclude that the district court did not abuse its discretion in approving the partial settlement.

### C. Adequacy of the Findings

As stated, the decision whether to approve a proposed settlement of a class action is left to the sound discretion of the district court. See Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 965 (3d Cir. 1983); Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). In Girsh, we set forth several factors a district court must consider when evaluating the adequacy, fairness, and reasonableness of a settlement:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

Id. at 157 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974)); see also Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118 (3d Cir. 1990). Here, the non-settling defendants argue that the district court failed to provide adequate findings to support its approval of the partial settlement.

> In approving the partial settlement, the court stated:
> 2. The proposed settlement . . . is fair, reasonable and adequate, is in the best interests of the Class and ITB and should be and is hereby approved, especially in light of the benefits to the Plaintiff Class and to ITB because of the complexity, expense and probable duration of further litigation, the substantial discovery and investigation conducted, the risks of establishing liability, causation and damages and, with respect to ITB, the complete and final settlement of all claims asserted on behalf of the Plaintiff Class against ITB and the judgment reduction provisions of the Order with respect to all remaining claims against the non-settling defendants.

JA at 1540-41. In addition, in its August 31, 1994 memorandum, the court addressed the non-settling defendants' objections and explained, in detail, the fairness and reasonableness of the bar order and the proportionate judgment reduction rule.

We have held that in order to provide for meaningful appellate review, a district court must explain its reason for approving a class action settlement agreement. See Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.), 494 F.2d 799, 804 (3d Cir.), cert. denied, 419 U.S. 900 (1974) ("It is essential in cases such as this that the district court set forth the reasoning supporting its conclusion in sufficient detail to make meaningful review possible . . . ."). The Bryan court noted that the "use of `mere boilerplate' language will not suffice." Id.;

see also Malchman v. Davis, 706 F.2d 426 (2d Cir. 1983) (no intelligent review on appeal where district court adopted state court referee's report, making no independent findings of fact or conclusions of law); Maher v. Zapata Corp., 714 F.2d 436, 455 (5th Cir. 1983); Gautreaux v. Pierce, 690 F.2d 616 (7th Cir. 1982) (district court must clearly set forth its reasons for approving the settlement in order to make intelligent appellate review possible); CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1797, at 359 & n.39 (1986).

Here, the district court's explanation meets the requirements set forth by this court in Bryan. The court made findings of the type articulated in Girsh, and it concluded that the partial settlement was fair, reasonable, and adequate. Further, the district court's memorandum of August 31, 1994, explained the appropriateness of the bar order and the proportionate judgment reduction provision in great detail. As we stated in Bryan, "To require a fuller statement of the court's views would turn a decision on approval of a proposed settlement into a determination on the merits in all but name." Bryan, 494 F.2d at 804. Contrary to the non-settling defendants' contentions, the court's explanation allows for a meaningful appellate review here.[19]

The judgment of the district court will be affirmed.

---

[19] The court has considered the non-settling defendants' additional contentions and found them to be meritless.