**In re CHAMBERS DEVELOPMENT SECURITIES LITIGATION.**

This Document Relates to:
All Class Actions.

MDL–982.
Civil A. No. 92–0679.

United States District Court,
W.D. Pennsylvania.

May 30, 1995.

Alfred G. Yates, Jr., Law Offices of Alfred G. Yates, Jr., Pittsburgh, PA, Mark C. Rifkin, Greenfield & Chemicles, Haverford, PA, Fred Taylor Isquith, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for plaintiffs.

William M. Wycoff, David G. Ries, Ralph F. Scalera, Craig E. Frischman, Joseph F. McDonough, Manion, McDonough & Lucas, Thorp, Reed & Armstrong, Pittsburgh, PA, for John G. Rangos, Sr., John G. Rangos, Jr., Alexander W. Rangos, Michael Peretto, Richard A. Knight, Joseph G. Stotlemyer, Hugh Scott, John M. Arthur, William E. Moffett.

Richard R. Nelson, II, Wayne C. Holcombe, Larry K. Elliott, Cohen & Grigsby, Pittsburgh, PA, for Grant Thornton, Richard Stewart, David Abramson, Domenick Esposito, Charles R. Fallon.

Howard A. Specter, George G. Mahfood, Specter Law Offices, Pittsburgh, PA, Arthur N. Abbey, Abbey & Ellis, Marian P. Rosner, Wolf, Popper, Ross, Wolf & Jones, New York City, for Cynthia C. Lovato, Jack Klein, Elizabeth Palazzo.

John W. Thomas, Zimmer Kunz, Pittsburgh, PA, Bruce K. Cohen, Robert M. Wolff, Meredith & Cohen, Philadelphia, PA, for Jeffrey Kaliser.

Kenneth A. Shemin, Rose Law Firm, Little Rock, AR, for Southeast Investments, Inc.

William M. Wycoff, David G. Ries, Ralph F. Scalera, Craig E. Frischman, Thorp, Reed & Armstrong, Pittsburgh, PA, Mark E. Davidson, James J. Markowski, Shea & Gould, Leon P. Gold, New York City, for Chambers Development Company, Inc.

Richard A. Finberg, Malakoff, Doyle & Finberg, Pittsburgh, PA, for Dean M. Panizzi, Dean of Shayside.

## MEMORANDUM OPINION

LEE, District Judge.

### I. INTRODUCTION

The issues before the Court in this multi-district class action securities litigation are: (i) whether the Court should certify a plaintiffs' class consisting of

All persons who purchased or acquired Chambers Development Company, Inc., securities from March 18, 1988, through October 20, 1992, inclusive, excluding the defendants herein, officers and directors of Chambers, members of the immediate family of each of the individual defendants and affiliates of the corporate defendants, partners and partnership defendants;

(ii) whether the Court should certify a defendant class consisting of 250 some partners of the accounting firm of Grant Thornton; and (iii) whether the proposed settlements of this litigation are fair, adequate and reasonable.

Upon consideration of the testimony and report of the Special Master appointed by the Court to oversee discovery and to monitor and facilitate settlement negotiations, the testimony and report of the independent real estate appraiser appointed by the Court to evaluate certain real estate which is to be transferred as part of the settlements, numerous affidavits of counsel and expert witnesses and others, memoranda and documentary material in support of settlement, and considering the entire record of the litigation with which the Court is intimately familiar, the Court answers an unqualified "Yes" to each of these questions.

On May 19, 1995, this Court conducted a hearing concerning the adequacy, fairness and reasonableness of proposed class actions settlements of all but one of the related cases that have been consolidated for all pretrial purposes and designated as appropriate for multidistrict litigation pursuant to 28 U.S.C. § 1407 and an Order of the Judicial Panel on Multidistrict Litigation;[1] the proposed settlements are set forth in the stipulations of settlement filed in the "main class action" at MDL NO. 982, initially filed at Civil Action No. 92–0679 (*Lovato, et al v. Chambers Development Company, Inc., et al*), and the "derivative action" at Civil Action No. 92–1081 (*Yeager, et al v. Rangos, et al*) which is part of the main class action.

## II. BACKGROUND

Regarding the main class action, the factual allegations of the Amended Consolidated Class Action Complaint (Amended Complaint) and this Court's legal conclusions in denying the various defendants' motions to dismiss are set forth fully in *In re Chambers Development Sec. Lit.*, 848 F.Supp. 602 (W.D.Pa.1994). This memorandum opinion on the fairness and adequacy of settlement presumes the reader's familiarity with the factual predicate set forth in that opinion; to the extent this presumption is incorrect, the reader is directed to that opinion.

The initial Complaint was filed in the *Lovato* action on March 18, 1992, at Civil Action 92–0679. The derivative action was filed on April 14, 1992.

The derivative complaint was filed on behalf of plaintiffs David and Sally Yeager pursuant to Fed.R.Civ.P. 23.1, on behalf of all other similarly situated shareholders, and derivatively on behalf of Chambers Development Company, against John G. Rangos, Sr., Chief Executive Officer of Chambers ("CEO"), and other members of Chambers' senior management and certain of its outside directors, as well as Grant Thornton, an accounting partnership which was Chambers' former independent auditor at most relevant times of the class period. The factual predicate for the derivative action is that which forms the basis for the Amended Complaint in the main class action with, however, certain nuances required by the derivative action device. Although named the nominal defendant in the shareholders' derivative action device, Chambers is the real party in interest, and any recoveries rendered to the derivative class of shareholder plaintiffs belong to Chambers, the corporation on whose behalf the derivative suit ostensibly was brought. *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1307 n. 4 (3d Cir.1993).

In summary, this litigation stems from allegations of fraudulent accounting policies and practices by Chambers and Grant Thornton regarding capitalization of normally expensed items, and the systematic dissemination of various material misrepresentations and omissions of material fact made by these defendants concerning the questionable nature of these accounting policies/practices, and of Chambers' earnings, assets and net worth, which consistently overstated earnings, exaggerated the state of Chambers' financial health, and artificially inflated the market price for its securities on the American Stock Exchange until the bottom fell-out of the market when Chambers corrected its

---

**1.** One of the related actions is *Option Resources Group, Inc., et al v. Chambers Development Company, Inc., et al*, Civil Action No. 93–0354.

Plaintiff Option Resources has opted-out of the class by filing a timely request for exclusion, and its claims will be prosecuted independently.

accounting practices and announced that correction to the trading public initially on March 17, 1992,[2] and thereafter.

The complaint in the derivative class action includes: claims for violations of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, and Securities and Exchange Commission ("SEC") Rule 14a–9 based upon allegations of materially false, incomplete and misleading proxy statements in 1990 and 1991 disseminated to its shareholders prior to the annual shareholders' meetings in those years at which Chambers' board of directors were elected (Derivative Complaint, Count I); for individual defendants' breach of fiduciary duties to the corporation (Count II); and against Grant Thornton for its alleged professional negligence as Chambers' independent auditors (Count III).

Derivative plaintiffs requested class certification, a declaration that the 1990 and 1991 proxy statements were materially false and misleading and the setting aside of the proxies voted as a result thereof, the setting aside of certain stock option plans which benefited individual Chambers defendants, monetary damages, injunctive relief in the form of internal safeguards to monitor against future abuses, interest, costs and counsel fees. (Derivative plaintiffs point out the section 14(a) misleading proxy statements claim now is moot "because the terms of the directors elected at the 1990 and 1991 annual meetings have expired." Memorandum in Support of Plaintiffs' Motion for Final Approval of the Proposed Settlement and In Support of Counsel's Application for Attorneys' Fees ("Derivative Memorandum"), Document No. 20 at Civil Action No. 92–1081 at 2 n. 1.)

By stipulation of the parties, Chambers and the individual defendants were relieved in November 1992, of their obligations to "move or otherwise respond to the derivative Complaint" until the earlier of several events, none of which has occurred. Therefore, neither Chambers nor the individual defendants have answered or responded to the derivative complaint. Derivative Memorandum at 3. Essentially, the derivative action has laid dormant since then, except to the extent counsel may have participated in any discovery and in negotiations attached to the main class action, until the stipulation of settlement was filed on February 24, 1995.

On March 7, 1994, two weeks after this Court denied the various motions to dismiss, the main class action plaintiffs moved this Court to certify the class pursuant to Fed. R.Civ.P. Rule 23(a) and Rule 23(b)(3), and sought to extend the class period beyond that charged in the Amended Complaint to include all purchasers of Chambers securities through October 20, 1992, upon allegations that subsequent to March 17, 1992, additional disclosures of additional accounting irregularities and further adjustments to previously reported profits produced additional negative impact upon the trading price of Chambers securities.

On April 29, 1994, the Court conducted a status/settlement conference to discuss with counsel their suggestions and recommendations with regard to methods of resolution of the outstanding issues in this case, including but not limited to settlement of the various claims asserted by all of the parties. At that time, the Court was made aware that class action plaintiffs had, not unexpectedly, upped the ante following this Court's ruling in their favor on the motions to dismiss. The Court concluded that this litigation required the appointment of a special master to aid the Court in the performance of its judicial duties, including the management of discovery and overseeing settlement negotiations. By Order of May 6, 1994, the Court held:

> It is the court's finding that the appointment of a Special Master will best promote the mandate of Fed.R.Civ.P. Rule 1 "to secure the just, speedy, and inexpensive determination of every action." Therefore, pursuant to Fed.R.Civ.P. Rule 16, 26 and 53, and the inherent authority of this court to supervise and administer pending cases, the court hereby appoints John J. McLean, Jr., Esquire, ... as Special Master, who shall be paid $225 per hour for performing his assigned duties. The court has determined the amount of compensation to be fair and equitable in light of the complex and difficult task to be assigned to the

2. Sometimes referred to as the "St. Patrick's Day Massacre."

Special Master and particularly in consideration of his unique experience and qualifications.

The appointment shall become final, unless objections are filed by any party on or before May 18, 1994.

In the absence of objections, the appointment of Special Master McLean became final. This Court issued Supplemental Orders defining the scope of his appointment and setting the amount and manner of his compensation. Case Management Order No. 4, filed on June 3, 1994, finalized the Order of appointment, and "assigned the duties of management, discovery and conducting of settlement negotiations and mediation of claims of the parties, *inter se*."

Following said appointment, Special Master McLean performed his charge (admirably, efficiently and professionally, the Court observes), filed monthly statements of fees charged for his services, as required, and periodically and regularly kept the Court apprised as to the status of settlement negotiations which were ongoing and continuous, and as to several discovery disputes which arose and which Special Master McLean resolved, upon the acquiescence of the parties to his recommended disposition of said discovery disputes, without additional intervention by the Court.

Given the delicacy of settlement negotiations in general and of the settlement negotiations in this litigation in particular, the Court, after consultation with the Special Master, decided to "lay off" deciding several pending motions, including the plaintiffs' Amended Motion for Class Certification (Document No. 124) and plaintiffs' Motion to Add Party Plaintiff (Document No. 199), in order not to influence the evolving settlement process or upset the emerging equilibrium.

After some substantial ups and downs and snags in the settlement process, the Court was advised in late 1994/early 1995 that stipulations of settlement were prepared and would soon be filed. The settlement negotiations finally bore fruit with a joint motion filed by the class plaintiffs in the main class action and by Chambers, the senior manage-

ment and outside director individual defendants, for preliminary approval of their stipulation of partial settlement, on February 24, 1995. (Document No. 245). Also on that date, a stipulation was filed in the derivative class action for settlement by all parties, except for Grant Thornton. (Document No. 13 at Civil Action No. 92–1081).

Status/settlement conferences followed in rapid succession on February 28, March 14, March 17 and March 20, which produced stipulations of settlements which would globally dispose of all of the remaining claims in this case. Fittingly, this global settlement was announced in open court on March 17, 1995,[3] three years to the date that Chambers announced that it was changing its long-standing accounting policies and practices which required it to revise its 1991 after-tax earnings from $49.9 million to $1.6 million, or from 83 cents a share to 3 cents a share, the announcement which sent shock waves through the market and spawned the more than 20 cases that have been consolidated in this action.

The Court approved the settlement class, *provisionally only*, for the purposes of disseminating the requisite notices required by Rule 23(c) and Rule 23.1 to all potential class members broadly defined in the main class action, and to all current shareholders of record in the derivative action. It was and is the Court's opinion that the proposed settlements reposed within the range of reasonableness that would permit the court to have the parties notify the potential class members, and that stipulations of settlement were the product of vigorous, arms' length negotiations between experienced adversaries following adequate discovery. *See* 2 *Newberg & Conte* ("*Newberg*") § 11.41 at 11–91.

### III. STIPULATIONS OF PROPOSED SETTLEMENTS

#### A. MAIN CLASS ACTION

All of the defendants have agreed to settle this action in three separate stipulations of settlement, with supplements or amendments, which if approved, will create a settle-

---

**3.** The "St. Patrick's Day Deliverance."

ment fund in the neighborhood of $95 million in cash, plus interest, (a nice neighborhood). Chambers, and its individual officers and directors first agreed to the settlement of the main class action, followed within days by the execution of the proposed settlements by Grant Thornton and the Underwriter defendants. In summary, the proposed settlements would arrive in the $95 million area, in the following manner:

(i) $25 million from Chambers;

(ii) $8 million from the individual directors and officers via their directors and officers liability policy ("D & O policy");

(iii) Approximately $53 million from a Transaction and Refinancing Payment to be entered between Chambers and U.S.A. Waste Services, Inc., or through another financing arrangement;[4]

(iv) $8.8 million from Grant Thornton;

(v) $300,000 from the settlement with the underwriters;

(vi) Additionally, the settlements provided that counsel for plaintiffs in the class action would apply to the Court for an award of attorneys' fees "not to exceed thirty percent (30%) of the Settlement Fund, and for the reimbursement of expenses (including expert fees and expenses) incurred on behalf of the class ... payable solely out of the Settlement Fund and ... deducted from the Settlement Fund prior to the distribution to the class. Counsel might also apply by the terms of this settlement to the Court for approval of an award of compensation to the main

class representative plaintiffs in the amount of $2,500 per plaintiff as incentive for prosecuting the class action in their name, to be paid out of the Settlement Fund";

(vii) The main class action settlements also contain a "recapture" provision that "in the event the Court disapproves any portion of the requested award of ONE MILLION NINE HUNDRED SEVENTY–FIVE THOUSAND DOLLARS ($1,975,000), plus interest, for fees and reimbursements of expenses in the Derivative Action settled concurrently herewith (*In Re: Chambers Development Co. Sec. Lit.*, Civil Action No. 92–1081), then the portion not approved shall be paid over into the Settlement Fund in this action ... "

The settlements together, if approved, would completely resolve the main class action litigation. The Chambers stipulation and the Grant Thornton stipulation contain provisions for the entry of Bar Orders eliminating any claims for contribution against the settling defendants by any non-settling defendants,[5] or provision for judgment reduction and indemnification by plaintiffs in the class to protect the settling defendants from any "claims-over" by any non-settling defendants. Because the settlements now provide for all defendants to release all claims and crossclaims, the necessity for the Bar Orders and judgment reduction and indemnification provisions should become moot, unless there is a failure of one of the contingencies to final consummation of the settlements (such as

4. This is an approximate figure because the Transaction and Refinancing Payment provisions provide just a little uncertainty in the final numbers, because of the operation of the following formula: the refinancing payment is $45 million, and the transaction payment is $5 million plus adjustments that will be based on current market value at the time that the contemplated merger between Chambers and U.S.A. Waste, which will be discussed more fully herein, is consummated. The adjustment will come from a formula whereby Chambers will pay an additional $16,000 for each penny above $4.50 per share of Chambers stock which is paid as consideration for the merger. At the time of the fairness hearing on May 19, 1995, counsel represented that the most current market value of Chambers common

stock being over $6 a share, this formula would result in an additional payment of $3,296,000 as of that time, a significantly higher figure than the parties had contemplated at the time the stipulations of settlement were entered into. This upward adjustment was demanded by class plaintiffs after the merger talks with USA Waste had improved Chambers' survivability as part of the merged entity.

5. The parties have submitted a revised proposed Bar Order on May 25, 1995, which is modeled on the language of the Bar Order approved by the United States Court of Appeals for the Third Circuit in *Eichenholtz v. Brennan*, 52 F.3d 478, 1995 U.S.App. LEXIS 6134 (3d Cir.1995).

failure of the Chambers–U.S.A. Waste merger or any non-frivolous appeals of the settlement order in this case to the Court of Appeals for the Third Circuit). *See* Plaintiffs' Memorandum of Law In Support of the Proposed Settlements (Document No. 286), at 6–7. The Bar Orders would not affect claims for contribution or indemnification in the *Option Resources* case or in any litigation instituted by any of the other members of the plaintiff class who have elected to exclude themselves from the class.

## B. DERIVATIVE ACTION

The essence of the stipulation of settlement in the derivative action is as follows:

(i) The Chambers settling defendants, through their D & O insurance carrier, have agreed to pay or cause to be paid to Chambers (the real party in interest in the derivative class action) $2 million;

(ii) Defendant John G. Rangos, Sr., Chambers' CEO, has agreed to transfer or cause to be transferred from Synergy Associates to Chambers, that certain real estate owned by Synergy Associates and situate in Penn Hills Township, Allegheny County, Pennsylvania, which presently houses offices of the Chambers Development Corporation, by way of a lease from Synergy Associates, and containing approximately 7.018 acres of land, having erected thereon an office building containing a gross floor space of approximately 55,-000 square feet; the market value of the leased fee estate has been appraised at $7,185,000 to $8,650,000, according to an appraisal by Omni Evaluation Services dated October 31, 1994 submitted by derivative plaintiffs (Document No. 19 at Civil Action No. 92–1081), depending upon whether Cham-

bers elected to exercise an option to renew the lease for an additional ten years as provided in the existing lease;[6]

(iii) Defendant Grant Thornton shall pay Chambers $200,000 and release all claims it has against Chambers arising from or related to the facts alleged in the Complaint;

(iv) The settlement also provides that Chambers shall implement, for a period of two years after the effective date of the settlement appropriate therapeutic measures, including appointment of an outside director who is a certified public accountant as Chairman of the Audit Committee of the Board of Directors. However, this obligation will end on the effective date of any merger of Chambers into a publicly-traded corporation, and will end on the day the U.S.A. Waste merger is completed.[7]

(v) Defendant John G. Rangos, Sr., will provide a $15 million personal guaranty with respect to the cash payments to be made by Chambers to settle the related securities class action;[8]

(vi) Additionally, Chambers has agreed to pay derivative plaintiffs' attorneys such fees as are approved by the Court in an amount "not to exceed $1,975,000," which includes reimbursement of all reasonable costs incurred and interest on such costs, which amount is to be paid from the proceeds of the D & O policy; Grant Thornton has agreed to pay the plaintiffs' attorneys' fees approved by the Court in an amount "not to exceed $200,000."

---

**6.** The principals of Synergy Associates are John G. Rangos, Sr., John G. Rangos, Jr., and Alexander Rangos.

**7.** Additionally, as will be discussed herein, Chambers and certain of its directors and officers are subject to a SEC cease and desist order (which the Court has approved this date) which effectively requires Chambers to implement appropriate therapeutic measures without regard to any settlement in these proceedings.

**8.** Although included as a part of the derivative action settlement, as derivative plaintiffs' counsel note, John Rangos Sr.'s personal guaranty is made "with respect to the cash payments to be made by Chambers *to settle the related securities class action*," Derivative Memorandum, at 6, and is in fact part of *that* settlement.

830

## IV. FAIRNESS HEARING— MAY 19, 1995

Pursuant to the notices sent out to potential class members and published in *The Wall Street Journal* and *The Pittsburgh Post-Gazette,* each on two occasions, in both the main class action and the derivative action, a hearing was conducted on May 19, 1995, as to the fairness, adequacy and reasonableness of the proposed settlements. No formal objections have been filed in the manner required in the notices and this Court's Order preliminarily approving the settlement class for purposes of conducting the fairness hearing, although several informal "objections" to or comments on the settlement and/or attorneys' fees in the derivative action had been filed and one such informal "objection" in the main class action, and there were no objectors who came forward at the fairness hearing to voice any opposition to the proposed settlements.

Special Master McLean testified at the fairness hearing, adopting his Report of Special Master Regarding Fairness and Reasonableness of Proposed Settlement (Document No. 288). Special Master McLean's report set forth the scope of the Court's appointment, which included "supervising the speedy and orderly progress of discovery," "mediating among the parties a resolution by settlement," and additionally, the Special Master noted he was authorized to engage in *ex parte* communications with the parties and their counsel with respect to settlement matters and to communicate *ex parte* with the Court as to the matters discussed. Case Management Order No. 4, ¶¶ 1, 6–7.

In his report and in his testimony at trial, the highly credentialed and thoroughly credible Special Master McLean, former distinguished Judge and Administrative Judge of the Court of Common Pleas of Allegheny County, Pennsylvania, detailed the nature and course of settlement negotiations and his involvement, his intimate familiarity with the respective positions of the parties and "the likely consequences to all interested parties if the litigation were to proceed to trial and appeal," and his conclusion that:

> The Special Master is satisfied that in addition to the advantages of settlement that exist with respect to all litigation, the advantages of settlement in this litigation are of extraordinary importance, given the severe financial consequences that might otherwise result to the class members, creditors, employees, shareholders, parties and others.

> The Special Master is satisfied, based upon his own observations and participation, that the settlements that have been reached and will be considered by the Court on May 19, 1995, were achieved only after extensive genuine, strenuous negotiation by the parties and was reached with all due fidelity of counsel to their respective clients. It is also the opinion of the Special Master that the substantive terms of the settlements are fair and reasonable in light of all the factors that are relevant to the settlement of any litigation.

> Consequently, it is the recommendation of the Special Master that the Court approve the proposed settlements....

Report of Special Master.

Special Master McLean's testimony at the fairness hearing embellished upon his reported findings and conclusions and on the scope of settlement negotiations, and elaborated upon the ups and downs of those negotiations. By inquisition of the Court, Special Master McLean also described his preeminent qualifications, educational and experiential, which completely and persuasively qualify him to opine with regard to the fairness of the proposed settlements.

On May 4, 1995, the Court appointed Mr. Daniel L. McCown, MAI–SRA, of Dan McCown and Company, Inc., as an independent appraiser to submit an appraisal of the value of the real estate owned by Synergy Associates to be transferred to Chambers Development as part of the proposed settlement of the derivative class action (Document No. 21, Civil Action No. 92–1081), and to review the report of Omni Evaluation Services dated October 31, 1994, that was submitted by derivative plaintiffs on April 24, 1995, pursuant to Order of this Court (Document No. 19). Mr. McCown appeared and testified as an expert witness of the Court pursuant to Fed.R.Evid. Rule 706, regarding the valuation of the real estate as a fee

simple estate without regard to the value of the leasehold estate, and he critiqued Omni Evaluation's valuation of both the fee simple estate and the leasehold. In his testimony, Mr. McCown adopted his report, Complete Self–Contained Market Value Appraisal (Document No. 25, Civil Action No. 92–1081), and explained some of its salient features and the approaches to valuation that he took, discussed his professional educational and experiential qualifications, analyzed the Omni appraisal of October 31, 1994, and an earlier Omni appraisal of December, 1992, and discussed the propriety of including the value of the leasehold estate in the valuation of the subject property.

All parties were given an opportunity to ask questions of both of the Court's witnesses, (the Court called Special Master McLean and Mr. McCown as its own witnesses, and conducted their direct examination). All parties declined to question Special Master McLean. However, derivative plaintiffs' counsel and counsel for John G. Rangos, Sr., had some questions for Mr. McCown concerning his and Omni's valuation of the real estate and the component features of their valuations.

The several of the twenty-some attorneys present at the fairness hearing articulated briefly, their positions with respect to settlement and to attorneys' fees. These presentations could afford to be brief in light of the flurry of filings that surrounded the fairness hearing. Given the complicated nature of this litigation, the number of parties and attorneys involved, and the wealth of material and information that has been produced in these proceedings and in the related SEC proceedings, the attorneys' filings, although abundant, are for the most part concise, clear and helpful, albeit somewhat daunting at first glance.

The materials filed preceding the fairness hearing and shortly thereafter include the following: affidavits of Attorneys William M. Wycoff, Richard R. Nelson, II, David A. Brownlee, David J. Manogue, regarding their respective clients' positions on the merits of the litigation and views on the fairness, adequacy and reasonableness of the settlements, and detailing settlement negotiation efforts over the three-year period that this litigation has spanned; affidavits of David J. Manogue, for class plaintiffs, and Fred Taylor Isquith for the derivative plaintiffs concerning notices to the class, publication of notices, requests for exclusions (opt-outs), time and manner of filing objections, etc.; plaintiffs' Co–Lead Counsels' Joint Affidavit in Support of Class Action Settlements and Fee Petition filed by Howard A. Specter, Arthur N. Abbey and Marian P. Rosner.

In addition, the Court has reviewed the affidavits of Candace L. Preston, CFA and Executive Vice President for Princeton Venture Research, Inc., a consultant and expert witness for the main class plaintiffs regarding market impact and potential damages to the class; affidavit of Kenneth A. Froot, economist and professor at the Harvard Business School, and expert witness for the defendant Chambers regarding market impact and damages to the class; affidavit of Frederick C. Dunbar, professor at Fordham Law School and Senior Vice President at National Economic Research Associates, Inc., on behalf of Chambers which sets forth an interesting comparison of the size of the proposed settlement in this case with other settlements of class action securities litigation throughout the country for a four-year period dating to January 1991; the appraisal filed by Omni Evaluation Services on behalf of derivative plaintiffs' counsel in that action, and the appraisal by Mr. McCown on behalf of the Court; and an affidavit by William Rodgers, Jr., currently the Chief Financial Officer for Chambers.

The Court also received and reviewed plaintiffs' Memorandum of Law In Support of the Proposed Settlements, a Memorandum of John G. Rangos, Sr., in Support of Approval of the Proposed Settlement, plaintiffs' Proposed Findings of Fact and Conclusion of Law Regarding Class Certification, the Derivative Memorandum; and a verified Joint Petition for Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards filed on behalf of the plaintiffs in the main class action.

Also before the Court are the SEC's Complaint and a Consent Order (which the Court has not yet approved but will do so today by

separate order) in the related case of *Securities and Exchange Commission v. Chambers Development Company, Inc.*, Civil Action No. 95–0693, and several cease and desist orders that were entered with consent in the SEC's administrative proceedings against certain Chambers' officers and directors, John G. Rangos, Sr., John J. Cushma, William R. Nelson, and Dale O. Nolder, Jr. (former Controller, and the predecessor to Mr. Cushma in that respect, of Chambers) which has been submitted as part of the record of the hearing of May 19, 1995.

In the derivative action, there also has been filed a Motion to Intervene and Consented To Stipulation and Order on Consent (Document No. 23, Civil Action No. 92–1081) (which the Court has not yet approved, but which it will do so today by separate order), which states that "plaintiffs in the certain derivative action pending in the Court of Common Pleas of Allegheny County, Pennsylvania, and plaintiffs in the certain derivative action pending in the Court of Chancery of the State of Delaware in and for New Castle County, request leave to intervene in the derivative action and be deemed and made parties plaintiff to the complaint in that action pursuant to the stipulation of all of these parties which, *inter alia*, requires the respective plaintiffs in the related state actions to 'take all steps required to dismiss those actions, without prejudice, and without cost to any party.'" Stipulation, ¶ 3. Dismissal of said related state actions are a condition of the finality of the proposed settlement of the derivative action.

## V. CERTIFICATION OF THE CLASS

Initially, the Court observes that, as should be apparent from the recitation in the preceding sections, the Court does not come to the certification of class issues blindly. To the contrary, the Court has been actively managing, through frequent communication with Special Master McLean and through conferences with counsel, the class certification and other discovery that has been preceding since this Court denied the motions to dismiss, concurrently with the ongoing settlement negotiations. Also as noted, this Court *provisionally* approved the settlement class,

broadly defined as all those who purchased Chambers securities during the broadest class period, namely:

All persons who purchased or acquired Chambers Development Company, Inc., securities from March 18, 1988, through October 20, 1992, inclusive. Excluded from the plaintiff class are the defendants herein, officers and directors of Chambers, members of the immediate family of each of the individual defendants and affiliates of the corporate defendants, partners and partnership defendants.

Additionally, plaintiffs seek certification of a defendant class consisting of defendants Richard Stewart, David Abramson, Domenic Esposito and Charles R. Fallon, each of whom is a managing partner of Grant Thornton, as representatives of the class consisting of all persons who are or were partners of Grant Thornton during the class period.

■ Whatever doubt may have existed in the Third Circuit as to the propriety of the "provisional settlement class" device, *i.e.*, where a court gives *preliminary approval* to a proposed settlement class only for the purposes of providing the ostensible members of that class with notices and the opportunity to be heard at a fairness hearing, those doubts were dispelled by the recent analysis of this issue and erudite explanation of the Court of Appeals for the Third Circuit's holding that:

We acknowledge that settlement classes, conceived of either as provisional or conditional certifications, represent a practical construction of the class action rule. Such construction affords considerable economies to both the litigants and the judiciary and is also fully consistent with the flexibility integral to Rule 23. A number of other jurisdictions have already accepted settlement classes as a reasonable interpretation of Rule 23 and thereby achieved these substantial benefits. Although we appreciate the concerns raised about the device, we are confident that they can be addressed by the rigorous applications of the Rule 23 requisites by the courts at the approval stages, as we discuss at greater length herein. For these reasons, we hold that settlement classes are cognizable under Rule 23.

*In Re: General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation* ("*GMC Litigation*"), 55 F.3d 768, 794, 1995 U.S.App. LEXIS 8815, *70 (3d Cir.1995) (Becker, J.).

And although the Court believes it has been the law in this circuit that, despite giving conditional approval to a settlement class, the district court nevertheless must issue formal findings that the prerequisites of Rule 23 have been met in order to formally certify the class, *see, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985), whatever doubts there were as to the district court's need to formally certify what had been provisionally certified as a class also have been firmly dispelled by the Court of Appeals in *GMC Litigation* which held "courts must make the findings because the legitimacy of settlement classes depends upon the fidelity to the fundaments of Rule 23." 55 F.3d at 794, 1995 U.S.App. LEXIS at *71. Indeed, as Judge Becker notes for that Court, "Inasmuch as collusion, inadequate prosecution and attorney inexperience are the paramount concerns in pre-certification settlements," courts have a heightened duty to scrutinize the proposed class and make the requisite Rule 23 findings based on the record before them. *Id.* at 795, 1995 U.S.App. LEXIS 8815 at *72–*82.

The prerequisites to a determination that an action is maintainable as a class, either of plaintiffs or defendants, are set forth in Rule 23(a) and (b), which provide in relevant part:

**(a) Prerequisites to a class action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Class actions maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(3) The Court finds that the questions of law or fact common to the members of the class predominate over any questions effecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In making its determination of the propriety of certifying a class of plaintiffs and a class of defendants in this litigation pursuant to Rule 23, the Court is guided in large part by Judge Becker's timely and scholarly analysis in the *GMC Litigation,* and is mindful of that Court's emphasis

that Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsels' ability to fairly and adequately protect class interests.... Thus, actions certified as settlement classes must meet the same requirements under Rule 23 as litigation classes. To allow lower standards for the requisites of the rule in the face of the hydraulic pressures confronted by courts adjudicating very large and complex actions would erode the protection afforded by the rule almost entirely.

*GMC Litigation,* 55 F.3d at 799, 1995 U.S.App. LEXIS 8815, at *87–*88.

Even subjected to the heightened scrutiny that is appropriate for evaluating the propriety of certifying a class that has been preliminarily approved as a settlement class, *id.,* this Court has no hesitation in holding that a settlement class of plaintiffs, as defined above, and the defendant class of Grant Thornton accountants should be certified pursuant to Rule 23(a) and (b). It is signifi-

cant that the proposed settlement encompasses the same class, class period and claims embodied in the Amended Complaint and motion for class certification, and that the settlement class was neither expanded or contracted to facilitate a speedier settlement.

## (A) THE PLAINTIFF CLASS

■ (1) *Numerosity*. As of May 9, 1995, some 29,145 notices had been mailed to potential class members of the proposed settlements, fee applications, requests for incentive awards and settlement hearing to be held on May 19, 1995. Amended Affidavit of David J. Manogue (Document No. 299) at ¶ 5, *see* Exhibit 2, Affidavit of Jeffrey D. Dahl with respect to mailing of notice. By 1991, there were over 66 million shares of outstanding Chambers stock held by over 1,500 shareholders, and during the class period, Chambers issued and sold over 8.3 million shares of Class A common stock and $110 million in convertible debentures in public offerings. There is no question that given the size of this class, joinder of the class members claims would be impracticable. *See Welch v. Bd. of Dir. of Wildwood Golf Club*, 146 F.R.D. 131, 135 (W.D.Pa.1993); *see also* 1 H. Newberg & A. Conte, *Newberg on Class Actions*, § 3.05, at 3–23 to 3–24 (3d ed. 1992) (where class numbers in the hundreds, thousands or larger, the impracticability of bringing all class members before the court is obvious, and the Rule 23(a)(1) numerosity requirement is easily met).

■ (2) *Commonality*. While not all questions of law and fact raised need be in common, *Hoffman Elec., Inc. v. Emerson Elec. Co.*, 754 F.Supp. 1070, 1075 (W.D.Pa. 1991), it is apparent that most of the questions of law or fact that would need to be addressed in the trial of this matter are common to the class. Common questions include whether Chambers and Grant Thornton's accounting policies and practices regarding capitalization of expenses amounted to bad judgment or active fraud; whether reports and statements disseminated by Chambers during the class period misrepresented or failed to state material facts concerning these accounting practices and Chambers true financial picture; whether

the defendants acted with the requisite degree of scienter to establish a Section 10b/ Rule 10b–5 violation under the securities laws, specifically whether they acted willfully or recklessly in omitting and/or misrepresenting material facts; whether the Underwriter defendants exercised due diligence; the appropriate measure of damages; and other common questions. Given the viability of the fraud on the market theory of reliance, *see Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) *and Peil v. Speizer*, 806 F.2d 1154 (3d Cir.1986), individual purchasers' reliance on fraudulent misrepresentations need not be proven but, rather, there is a presumption of reliance under this theory. Nevertheless, while certain questions peculiar to certain individual plaintiffs might have remained for resolution, there are important, compelling and controlling common questions of law or fact which meet the prerequisite for class certification of Rule 23(a)(2).

■ (3) *Typicality*. Generally, a representative plaintiff's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." 1 *Newberg*, § 3.13 at 3–76. In the context of Rule 23(a)(3), "typical" does not mean identical. *Eisenberg*, 766 F.2d at 786. The focus of the typicality requirement is whether the class representatives themselves present common issues of law and fact that justify class treatment, thereby assuring that absent class members are adequately represented. *Eisenberg*, 766 F.2d at 786; *Friedman v. Lansdale Parking Auth.*, 1993 WL 338174, *3, 1993 U.S.Dist. LEXIS 12019, *8– *9 (E.D.Pa.1993). The more than forty representative plaintiffs stand essentially in the same position as other potential class members here with regard to the legal theories they advance which are basic and essential to the claims of all members of the class. The Court finds that the typicality requirement is plainly met.

■ (4) *Adequacy of Representation*. Finally, Rule 23(a)(4) requires the Court to determine whether the representative parties will fairly and adequately protect the inter-

ests of the class; to perform this duty, the Court must determine (i) the qualification and competence of plaintiffs' attorneys; and (ii) whether representative plaintiffs' interests are antagonistic to those of the class. *See e.g., Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *see also GMC Litigation*, 55 F.3d at 800–01, 1995 U.S.App. LEXIS 8815 at *93–*97.

■ On the first prong, there is no serious suggestion, in the Court's view, of any antagonism within the potential class amongst its members who have not opted-out of the class. Initially, the Court considered but rejected the use of sub-classes to reflect several possible distinct groups of purchasers of Chambers securities during the class period.[9] Possible subgroups might include those who both bought and sold Chambers securities within the class period, those who bought during the class period but sold after, and those who had purchased convertible debentures during the period and converted them to common stock during the class period.

However, the Court is convinced, after reviewing the mechanics of the distribution system agreed to by the parties that the calculation of recognized loss adequately will account for the somewhat divergent, but *not antagonistic*, positions of these various groups. It is apparent that the rights of the

*entire* class and of all the representative plaintiffs represented by some 39 law firms (primarily by early-designated Co–Lead Class Counsel) have been vigorously pursued throughout this litigation, and that those rights have been vindicated and the damage to those rights recompensed in an equitable manner, without offering considerably more or undeserved value to one group of securities purchasers over another. The affidavit submitted by the plaintiffs' expert, Ms. Preston, amply and reasonably supports the Court's finding that the claims of the various representatives are not antagonistic and that the terms of the distribution of the Settlement Fund will provide just compensation to all members of the class.[10]

As to the second prong, the adequacy of representation by class counsel, the Court could *almost* say that the impressive qualifications, extensive class action and securities experience of all of the active attorneys who have participated most vigorously as Co–Lead Counsel, and whom the Court has observed up-close and personal for three years, and their financial and professional capabilities in conducting complex multi-district litigation, *goes without saying;* nevertheless, the Court will say it.

First, the Court's views as to the competence and qualifications of all active counsel are fully shared by Special Master McLean, who had even more contact with the attorneys, and who is eminently qualified to evaluate the caliber of representation of those he

---

9. The creation of sub-classes is left to the discretion of the district court, and is appropriate only "when the court believes it will materially improve the litigation." *Clark Equip. Co. v. Int'l. Union, Allied Indus. Workers of America*, 803 F.2d 878, 880 (6th Cir.1986). Sub-classing is not encouraged because of the potential to "compound confusion and cost." *Georgine v. Amchem Products, Inc.*, 157 F.R.D. 246, 318 (E.D.Pa. 1994), *quoting County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1447 (E.D.N.Y. 1989) (additional citation omitted). And, though not dispositive, federal courts have found sub-classes to be less useful in opt-out class actions under Rule 23(b)(3) because class members who are not satisfied with the terms of the proposed settlement may easily exclude themselves from the class and pursue their own actions. *Georgine*, 157 F.R.D. at 319 (citations omitted). Moreover, the burden of demonstrating the need for sub-classes is on the proponent of sub-class-

ing, *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 407–08, 100 S.Ct. 1202, 1214–15, 63 L.Ed.2d 479 (1980), *cited in Georgine*. Here, no one has proposed the class be subdivided, although the mechanism for distributing the settlement fund does recognize some differences within the class for distribution purposes.

10. Certain defendants had challenged the typicality and adequacy of representation regarding some of the representative plaintiffs, including Samuel Blaufeld, Lawna Blankenship and James Muse and David Kaplan. The challenges to those plaintiffs were not serious enough to have detained the Court for long as the Court felt early on in this litigation, and continues to feel now that the representative plaintiffs are typical in legal theory to the rest of the class, and that their representation by class counsel has been and is more than adequate.

works with and encounters in this profession. Second, the pleadings filed on behalf of all counsel in this case (defense counsel as well), and the prosecution (and defense) of this litigation throughout have been remarkably professional and well-managed and exhibit a level of securities and class action sophistication that served their respective clients extremely well. Third, the "proof is in the pudding" and the settlement in this case is an excellent one, as will be discussed at greater length elsewhere in this opinion.

The Court has no difficulty pronouncing the requisites of Rule 23(a)(1)–(4) have been met.

■ Similarly, the Rule 23(b)(3) analysis gives the Court no pause. Securities class actions seeking monetary damages have been brought "almost exclusively" under the Rule 23(b)(3) category, 2 *Newberg*, § 22.46 at 22–188, and this is no exception. Amended Complaint, ¶ 38 ("Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) ... on behalf of all persons who purchased or acquired Chambers securities from March 18, 1988 through October 22, 1992."). "Class actions are a particularly appropriate means to resolve claims based on securities laws." *Eisenberg*, 766 F.2d at 775; *see* 2 *Newberg*, § 22.01 at 22–5. Common questions of fact and law predominate in this litigation, and there is no question the class action device is superior to the maintenance of numerous individual actions.

■ Finally, inasmuch as actual notice was mailed to almost 30,000 potential class members, in addition to the published notices in the *Wall Street Journal* and *Pittsburgh Post–Gazette*, the Court finds notice to have been the best possible notice, satisfactory of Rule 23(c).

For the foregoing reasons, the Court will certify the plaintiff class as defined above.

**(B) THE DEFENDANT CLASS**

■ The Court will not belabor the obvious; under the standards set forth above, and with the recent guidance of the Chief Judge of this district who recently certified a defendant class consisting of a partnership of accountants in a securities fraud litigation wherein the accountants were charged with "cooking" the books of the corporation for which the firm had been hired as independent auditors and giving the corporation false "clean" reports, the Court finds that the proposed class of Grant Thornton partners satisfies the numerosity, typicality, adequacy of representation, and common and predominant questions of law and fact prerequisites, and that the class device is superior to treating these defendants individually. *See In re: Phar–Mor, Inc. Sec. Lit.*, 875 F.Supp. 277 (W.D.Pa.1994) (certifying a non opt-out class of accountants in a partnership pursuant to Rule 23(b)(1)(B)). As in *Phar–Mor Litigation*, the prosecution of separate actions against individual Grant Thornton partners would substantially impair the ability of the individual class members to protect their interests, and fully comports with due process concerns. Accordingly, the Court will certify the defendant class of approximately 250 Grant Thornton partners, pursuant to Rule 23(b)(1)(B) and 23(b)(3).

## VI. FAIRNESS, ADEQUACY AND REASONABLENESS OF THE PROPOSED SETTLEMENTS

■ The Rand–McNally of class action settlement review in the Third Circuit remains the nine-factors enunciated in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975), which, though twenty years young, has withstood the test of time. *See e.g., GMC Litigation*, 55 F.3d at 804, 1995 U.S.App. LEXIS 8815 at *107; *Eichenholtz*, 52 F.3d at 488, 1995 U.S.App. LEXIS at *33–*34. In fulfillment of its obligation under Rule 23(e) ("A class action shall not be dismissed or compromised without the approval of the court ..."), the district court will approve the settlement of a class action only if it is fair, reasonable and adequate. *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983). To that end, the Court will review the proposed settlements of the main class action and the derivative action with reference to the nine *Girsh* factors.

It is *especially* at this point that the Court's obligations approach that of a fiduciary entrusted to look after the interests of the absent class members. This fiduciary re-

sponsibility requires the Court to be wary of the possibility of collusion. *GMC Litigation,* 55 F.3d at 805–06, 1995 U.S.App. LEXIS 8815 at *113–*114. The Court is also guided by the recent admonition of the Court of Appeals for the Third Circuit "to be even more scrupulous than usual in approving settlements where no class has yet been formally certified." *Id.* at 805, 1995 U.S.App. LEXIS 8815 at *113.

(1) *The Complexity, Expense and Likely Duration of the Litigation.*

■ The continuation of these proceedings would undoubtedly prove costly, lengthy and consume inordinate chunks of this Court's docket, not to mention the legal resources of a phalanx of attorneys, at great cost to their clients and to the available common fund likely to be created at the end of the litigation a long way down the road. It is safe to say, in a case of this complexity, the end of that road might be miles and years away.

A trial would necessitate the usual battle of experts on both the liability issues and the damages issues, and their sub-issues. Moreover, trial would involve quite a large number of fact witnesses, given the scope and duration of the alleged fraudulent practices and number of disseminations of misleading information, plus the involvement of not just many officers and directors and employees of the corporation, but also of the accountants. Needless to say, the existing D & O policy limits would be hemorrhaging from a significant heating-up and extension of the adversary proceedings.[11] Of course, there is also the likely prospect of costly appeals by any disappointed litigants following any verdict.

(2) *The Reaction of the Class to the Settlement.*

The reaction of the class has been fairly restrained. There has been one large but anticipated institutional shareholder who has requested exclusion, Option Resources Group, and 11 others.[12] Option Resources has filed a separate action previously consolidated for pretrial purposes, Civil Action No. 93–0354, which now will proceed independently. The number of exclusions by shares, though it exceeds the number contemplated by the provision of a confidential agreement of the parties that would permit a party to opt-out of the settlement in the event exclusions exceed a certain number of shares (for obvious reasons), is only a small fraction of the total number of shares outstanding as of 1991 which numbered in the tens of millions. (Plaintiffs' expert on damages, Candace L. Preston, calculated there were over 3 million shares of common stock and over 38 million shares of Class A common stock outstanding as of March 18, 1988. Preston Affidavit (Document No. 282) at ¶ 12.) Significantly, there has been no indication that any of the defendants intend to exercise the option that had been available under the side agreement to withdraw from the settlement, and to the contrary, from post-fairness hearing submissions, it is apparent the number of exclusions has not engendered serious reservations by the parties, nor to the Court which will inevitably consolidate any newly filed cases with the *Option Resources* case.

Moreover, there were no objections filed in the manner described in the notices to the class, and no objectors appeared to voice their opinions at the fairness hearing; however, one objector did send a handwritten letters to the Court which has been made a part of the record (Document No. 296) (and which the Court has in fact considered).

(3) *The Stage of the Proceedings and the Amount of the Discovery Completed.*

In the Court's view, now is the *optimal* time to settle this litigation before we reach

---

11. Counsel fees and expenses of litigation are paid out of the policy limits.

12. Actually there had been twenty-six requests for exclusion as of May 17, 1995, although fifteen of those are related (the "Moran group"). Supplemental Affidavit of David J. Manogue Concerning Requests for Exclusion (Document No. 298, filed under seal). However, the Court has granted the request of one of the excludees, Mr. Roger B. Davies, to withdraw his request for exclusion and take part in the distribution of the settlement fund. The number of known shares represented by the requests for exclusion are approximately 4,000 except for those owned by the Moran group, which number approximately 483,000. The number of shares owned by the Option Resources Group, which had filed its own action at Civil Action 93–0354, is not known at this time but presumably is substantial.

the point of diminishing returns. By class action standards, three years between filing suit and settlement are about average, maybe even a little on the less than average side. Marino and Marino, *An Empirical Study of Recent Securities Class Action Settlements Involving Accountants, Attorneys or Underwriters*, 22 Securities Regulation Law Journal, 115, 127–29 (Summer 1994) (between 1989 and 1994, the average time to settle a class action securities lawsuit was 3.9 years). But sufficient time has elapsed to allow a great deal of discovery of not only class certification information but also substantive discovery of material generated by the SEC investigations of Chambers, Grant Thornton, and many of the individual defendants in administrative proceedings roughly paralleling these.[13] Additionally, it is apparent that each side has analyzed the strengths and weaknesses of its own case in comparison to those of the other side with reference to experts in the accounting profession with regard to the critical factual issue in the case, "Was it reasonable to capitalize expenses for all those years without contemporaneous bookkeeping, or what?"

(4) *The Risks to Both Sides of Establishing Liability.*

Plaintiffs believed they had a great case on liability; defendants believed they had great defenses in whole or in part. Each side has submitted their views of the merits of the case, and this Court has had the benefit of the resolution of the related SEC proceedings which, while evidencing that Chambers, Mr. Rangos, Sr. and other officers and directors had violated some SEC rules, did not provide the "killer" resolutions of the fraud charges that plaintiffs certainly would like to have seen.

The point is, while the Court agrees the plaintiffs had a strong case against both the Chambers defendants and the Grant Thornton defendants, they clearly had their work cut-out for them to convince a jury of their allegations, especially with the defendants squaring-off against one another. A major battle would have been the one between the numerous experts the trial most certainly would have produced and the risks of convincing the jury which expert to believe.

As the class plaintiffs outline with reference to abundant authority in their Memorandum of Law in Support of Settlement, at 20–26, risks and uncertainties attend any complex litigation such as this, making it difficult, if not impossible, to accurately predict the outcome of either the trial or the inevitable appeal.

A very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes.

(5) *The Risks to Both Sides of Establishing Damages.*

The Court need look no further than the affidavits submitted by the economists and academics who rendered their expert opinions on the damage potential of this case. Ms. Candace L. Preston, CFA & Executive V.P. for Princeton Venture Research, Inc., consultant and expert witness for the plaintiffs regarding market impact, potential damages to the class, submitted an affidavit (Document No.282) which states her background generally, her methodology, some caveats and other information, and concludes that the total maximum possible damages were $680,-506,180.00 to purchasers of Chambers stock during the class period. Given her caveats, Ms. Preston suggests this figure may be overstated, although she is not specific about the extent of possible overstatement.

Chambers submitted the affidavit of Mr. Kenneth A. Froot, economist & professor at Harvard Business School with his expert opinion on the damages to the class. His "bottom line," after considering Ms. Preston's report/affidavit, and pointing out his view of its flaws, is that the $680 million figure is considerably overstated, and that the actual damages to the class in his estima-

---

**13.** Co–Lead Counsels' Memorandum of Law in Support of the Proposed Settlements represent that "Nearly a million pages of documents have been reviewed by plaintiffs' counsel," in addition to interviews of key witnesses and analysis of deposition transcripts of the important witnesses at the SEC administrative proceedings. The Court does not consider that figure to be an unreasonable estimate.

tion is "conservatively ... about $262 million, and may be more like $150 million ..."

It is apparent upon reviewing these two reports that the issue of damages would be hotly contested, would feature numerous expert witnesses who would express reasonable sounding but wildly divergent views as to the amount of damages at stake, and that the jury would have to struggle to choose the appropriate method of valuation (always a subjective exercise) and establish the amount. This is do-able, of course, but is fraught with risks to both sides.

**(6)** *The Risks of Maintaining the Class Action Through the Trial.*

The Court does not see much danger that this would not have proceeded as a class, and indeed, the Court was inclined to certify the class over one year ago, but decided to hold that issue in abeyance in light of the serious and delicate settlement talks that were under way.

**(7)** *The Ability of the defendants to Withstand a Greater Judgment.*

Where the ability of the defendant to take a bigger hit is in doubt, or indeed when the very life of the defendant is threatened by the continuation of the proceedings, the courts generally view this as a major factor weighing in favor of approving the settlement. *See 2 Newberg* § 11.50 at 11–122–11–124 (collecting cases); *See In re: Greenwich Pharm. Sec. Lit.,* 1995 WL 251293, *5, 1995 U.S.Dist. LEXIS 5717, *12–13 (E.D.Pa.1995).

As has been clear for quite some time, the Chambers Development Company had fallen on hard times from the heyday of its meteoric rise in the solid waste management/landfill industry following the St. Patrick's Day Massacre of 1992 (and subsequent) disclosures of its true financial picture. Its stock had fallen from over $30 @ share to less than $2 @ share at one point, and the wolves (creditors, including secured creditors of over $300 million debt) were at the door for timely payment of their loans which were in default. Bankruptcy was, and probably still is in the absence of completion of the settlement and merger with USA Waste, a distinct and very real possibility.

As Special Master McLean so eloquently phrased it at the fairness hearing and in his report, the consequences of the failure to settle would be "disaster" for the parties, creditors, shareholders, employees and others.

What makes the settlement so crucial to Chambers vitality is the planned merger with USA Waste which is contingent upon the Court's approval of the settlement and the uneventful passage of the appeal period. (Understandably, USA Waste is not interested in buying a lawsuit.) Completion of the merger provides the expected source for the bulk of the settlement fund and will enable Chambers to pay its debts and rise from the ashes, albeit in a new (merged) corporate form. (Moreover, the contemplated merger sent the parties back to the drawing table as plaintiffs jockeyed for advantage and renegotiated additional compensation for the plaintiff class, over the Chambers defendants' serious opposition and protest.)

Chambers precarious financial condition is a major factor favoring approval of the settlement. Moreover, although Grant Thornton's financial position is not as well documented, there has been mention that its liability insurance policies for the years in question are already partially depleted and that any substantial judgment beyond the limits of those policies might result in the inability of Grant Thornton to remain a viable partnership.

**(8, 9)** *The Range of Reasonableness in Light of the Best Possible Recovery, and in Light of All the Attendant Risks of Litigation.*

This is an easy one, whether the settlement is viewed in light of the best possible recovery or in light of all of the attendant risks of litigation. "This inquiry measures the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case." *GMC Litigation,* 55 F.3d at 806, 1995 U.S.App. LEXIS 8815 at *115 (collecting cases). In making the necessary economic valuation of the settlement, the "evaluating

court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Id.* at 806, LEXIS at *116.

The "best possible recovery" might be taken to be the $680 million figure the plaintiffs' expert on damages estimated to be the "maximum theoretical damages to the Class." · Affidavit of Candace L. Preston. (Document No. 282) Yet as Ms. Preston herself recognized and disclaimed by caveat, this figure may be significantly overstated as several of its assumptions are open to question and the methodology, while seemingly reasonable and in accepted use, is not free from all criticism either. *See* Preston Affidavit at ¶¶ 9, 10; Affidavit of Kenneth A. Froot, disputing Ms. Preston's evaluation and arriving at a range of $150 to $262 million. (Document No. 292) One of the major issues regarding the potential damages is the assumption that most of the decline in value of Chambers stock during the class period was attributed exclusively to the alleged fraud or whether external conditions in the industry substantially contributed to the decline, as defendants' expert suggests. *See In re SmithKline Beckman Corp. Sec. Lit.,* 751 F.Supp. 525, 529–30 (E.D.Pa.1990). In the Court's view, the "best possible recovery" is undoubtedly some figure between these two estimates, most likely substantially less than the $680 million figure.

Important in the Court's evaluation of the reasonableness of this settlement is a comparison to settlements reached in similar securities class actions. Viewed in that light, the settlement of this class action is excellent, indeed. *See* 1 *Newberg* § 11.02 at 11–5–11–6, and 11–6 ·n. 13 (giving examples of "large securities settlements" in the range of between $3 million and $52 million). Although this is not an exact science and although it is perhaps misleading to compare an abstract body of securities cases without detailed analysis of the nature of the claims, the duration of the alleged securities laws violations, the comparative numbers of potential shares involved, etc., nevertheless, the *Newberg* illustrations of these "large securities settlements" and this Court's own research of securities settlements in this circuit confirm that there has never been a larger one, nor have there been many larger in the country. *See, e.g., U.S. Bioscience Sec. Lit.,* 155 F.R.D. 116, 117 (E.D.Pa.1994) (settlement of $5+ million in cash and $10 million in securities); *SmithKline Beckman Sec. Lit.,* 751 F.Supp. 525 (E.D.Pa.1990) ($22 million cash).

Chambers' expert witness, Frederick C. · Dunbar, has prepared an elaborate and, the Court must say, impressive in its thoroughness and methodology, report exhaustively analyzing the data available over a recent four year period regarding all class action securities settlements for which there is sufficient information available to make comparisons meaningful. Dunbar Affidavit (Document No. 293). Let's cut to the chase here: Professor Dunbar's "bottom line" is that, at $93.7 million (the estimated recovery based on the formula previously discussed at the time of Dunbar's calculations, which since has gone up), "the proposed Chambers settlement is the *largest cash class action settlement* for shareholders of an issuing firm making alleged misstatements that we have found since January 1991 (the earliest date in the National Economic Research Associates, Inc. (NERA) securities class action settlement database)." Dunbar Affidavit at ¶ 2. Dunbar further concludes that, applying the NERA equation developed from the database for predicting the outcome of securities class action settlements, the settlement in this litigation is much higher than would have been predicted. Dunbar Affidavit at ¶¶ 2, 6–7.

The Court finds that the value of the settlement is *well* within the range of reasonableness in light of the best possible recovery for the class, and in fact is probably significantly above the range. Viewed in light of the attendant risks to recovery of continued litigation, the Court is even more convinced that this is an excellent settlement. In short, without this settlement, the shareholders might have gained nothing, inasmuch as Chambers was teetering on the edge of bankruptcy with the secured creditors queuing up to lay their claims to the kitty. Whether anything would have been left for the share-

holders to satisfy any judgments they obtained miles down the road is problematic to say the least.

## CONCLUSION

The Court concludes the settlement of the main class action is fair, reasonable and adequate, and will approve it.

## (B) THE DERIVATIVE ACTION

 Presumptively, the settlements of derivative class actions are to be evaluated according to the traditional *Girsh* factors, *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir.1993), and this Court will endeavor to do so. Because the corporation is the real party in interest and the benefits to be gained will be reaped by the corporation, the "principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation.... The adequacy of the recovery must be considered in light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation." *Id.* at 1311, *quoting Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir.1978).

 However, it must be noted that the Court does not review the settlement of the derivative action in a vacuum, but in conjunction with its review of the settlement reached in the main class action, of which this derivative action is merely an appendage. In fact, each settlement is contingent on the Court's approval of the other, and each is inextricably intertwined with the other. For example, to the extent the Court does not approve derivative plaintiffs' counsel's request for up to $2 million in attorneys fees, the amount not approved is to be captured by the main class action settlement and returned to the Settlement Fund.

Moreover, it is hard to view the derivative action as a "true" class action and evaluate it on its own merits. Not much has been done separately in the derivative action since early in the litigation (November 1992, according to derivative plaintiffs' counsel, Derivative Memorandum at 3) as the parties to this action agreed to abide certain events in the main event. There also has been no separate motion for certification of a class of plaintiff shareholders in the derivative action.

With that in mind, the Court will briefly run through the *Girsh* factors relevant to this derivative action.

Analysis of the following factors is essentially the same as the analysis of these factors in the preceding sections approving the main class action settlement, and therefore are merely listed: the complexity, expense and likely duration of the settlement, the stage of the proceedings, the risks to both sides of establishing liability and damages, and the risks of maintaining the class action through trial. These *Girsh* factors favor the settlement. Discussion of factors peculiar to the derivative action and worth discussing separately follows.

### (1) *The Reaction of the Class to the Settlement.*

As with the main class action, reaction of the class has been rather tepid. Only a few non-formal "objections" have been filed (Documents No. 15 (two letters), 16) which mostly complain (with some justification) of the attorneys fees requested by derivative plaintiffs' counsel. The mild response of the class is a factor in favor of settlement on the terms proposed.

### (2) *The Ability of the Defendants to Withstand a Greater Judgment.*

Although Chambers is the real party in interest and is a defendant in name only, the ability of the other defendants to withstand a greater judgment is practically nil given they are, as the Court finds in the preceding sections, just about tapped-out from the settlement in the main event in which the plaintiffs' counsel assures us (and this Court's observations confirms) they were rather successful in squeezing out the "last buck" from all defendants. Moreover, the source of any judgment against the individual officers and directors in the derivative action as well as the main class action is the D & O policy which will be completely drained by the combination of settlements, $8 million for the class action and $2 million for the derivative action almost all of which is earmarked for

the derivative plaintiffs' attorneys; the total is $10 million in any event, and will stay $10 million if the Court approves less than the amount of attorneys fees requested, by operation of the recapture provision in the settlement of the main class action.

(3, 4) *The Range of Reasonableness in Light of the Best Possible Recovery and the Attendant Risks of Litigation.*

The non-monetary effects of the settlement are almost inconsequential. (The Court recognizes that non-pecuniary benefits to the corporation may support a settlement of a derivative class action. *Bell Atlantic,* 2 F.3d at 1311.) The safeguards "imposed" by the settlement would seem to be required in any event by the SEC's cease and desist orders entered by consent against four former and current officers and directors of Chambers, including John G. Rangos, Sr., and by the Consent Order that will be entered today in *SEC v. Chambers Dev. Co., Inc.,* Civil Action No. 95–0693. And by its own terms, the settlement provides the "safeguard" obligations imposed thereby would terminate in the event the USA Waste merger is consummated, and if it isn't, the settlement is off anyway.

The $2 million cash from the D & O policy is slated to go almost entirely to plaintiffs' counsel, and to the extent it does not, it will go back to the Settlement Fund in the main class action to be distributed to the shareholders; it is difficult to see the value to the corporation of this proviso, or of the $200,000 that will be paid by Grant Thornton to the derivative plaintiffs' counsel, bypassing the corporation entirely.

The $15 million personal guarantee of John G. Rangos, Sr., is an interesting inclusion in *this* settlement's terms because it is a condition of the settlement of the main class action that Mr. Rangos "provide a $15 million personal guarantee with respect to the cash payments to be made by Chambers *to settle the related securities class action.*" Derivative Memorandum at 6.[14]

Thus, it seems to the Court that the sole value to the corporation of the settlement of the derivative action is the value of the real estate to be transferred from Synergy Associates/John G. Rangos, Sr. to Chambers, the real estate which serves as Chambers headquarters in Penn Hills, Pennsylvania. By this transfer, Chambers will no longer have to pay rent to Synergy Associates for the life of the lease (and any possible renewals), or *the real estate can be included in the contemplated merger with USA Waste* (which the attorneys for Chambers have indicated will happen).

The Court has studied the Appraisal by Omni Evaluation Services Dated October 31, 1994 (Document No. 19, Civil Action No. 92–1081) and the independent appraisal prepared shortly before the fairness hearing by Mr. Dan McCown at the behest of the Court, and has carefully considered his testimony and responses to questions posed by the Court and by counsel for derivative plaintiffs and Mr. Rangos. The Court is satisfied that the most reasonable estimate of the value of the subject real estate is made without regard to the value of the leasehold interest given that the value of the lease by Chambers to Chambers would be somewhat speculative at best and subjective to say the least.[15] That value, the Court finds in reliance on the expert report of Mr. McCown, is $4 million. However, that value would be further reduced by the extent of the encumbrances described in the Omni Evaluation

**14.** The Court notes the derivative counsel informed it they were "in the process of obtaining an opinion regarding the value of this guarantee." Derivative Memorandum at 17–18. They have not done so, although it does not matter much because any value of the guarantee goes to the main class action settlement payments on which the personal guarantee is made.

**15.** In Pennsylvania, whose laws govern the lease, the general rule is that purchase of the fee simple by the tenant results in the merger of the lease-

hold with the fee. *Waldron v. Wahl,* 286 Pa. 237, 133 A. 252 (1926) (general rule is that where a person holds a term for years and subsequently acquires the fee, "the former is lost and merged in the latter"); *see also* Friedman, *Pennsylvania Landlord–Tenant Law and Practice,* § 3.5(a) ("The sale of the leased premises by the landlord should have no legal effect upon the continuation of the lease agreement, unless the leased premises was sold to the tenant, in which case the lease terminates by operation of law.")

Services appraisal dated October 31, 1994, including the balance due on the mortgage on said property held by the Allegheny County Industrial Development Authority which, as of March 17, 1995, was $1,960,000. Derivative memorandum at 6.

The derivative plaintiffs' counsel have offered no authority to support their contention that the value of the subject property should include some value for the lease (which they estimate as between $2.65 million if Chambers would not exercise the renewal option and $4.5 million if it did) which would produce a range of $7.185 million to $8.65 million, substantially upping the value of this aspect of the settlement, and attorneys fees (if fees are to be awarded on a contingent basis). It is noteworthy that the Omni evaluation of the fee simple interest without regard to the value of the lease is about $4.123 million, a figure quite close to Mr. McCown's value of the fee simple, although the methodology Omni used was quite different than Mr. McCown's three methods (which arrived at remarkably but coincidentally identical $4 million figures). However, in the opinion of Mr. McCown, Omni's method of valuing the fee simple was not unreasonable.

### CONCLUSION

The settlement of the derivative action does add value to the overall settlement of the related actions, but not nearly as much as the derivative plaintiffs' counsel would have it. To the contrary, the value of the settlement to the corporation is in the neighborhood of $4 million dollars. Nevertheless, the Court does not hesitate to find this a reasonable, fair and adequate settlement of the derivative action in light of the settlement of the main class action and its recapture provision.

As the parties have pointed out, the Court is not at liberty to rewrite the terms of the settlement of either the main class action or the derivative action, but must only determine whether they should be approved in whole, and in this regard the judgment of counsel is entitled to substantial weight. *See, e.g., Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615, 625, 630 (9th Cir.

1982), *cert. denied* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983); *Metropolitan Pittsburgh Crusade v. City of Pittsburgh,* 686 F.Supp. 97, 102 (W.D.Pa.1988). Because of the intertwined nature of the derivative settlement with the main class action settlement, the Court is satisfied that they provide a thoroughly acceptable package, fair, reasonable and more than adequate to the shareholder plaintiffs class and to the corporation as real party in interest in the derivative action.

### VII. ATTORNEYS' FEES

The merger with U.S.A. Waste is on a tight time table; time therefore is of the essence because the merger is necessary to the execution of the settlement (unless some other refinancing source is miraculously obtained). The Court's review time has been shortened because of some last-minute wrangling between the parties after the first major domino (settlement) had been reached in principle which delayed presentation of the stipulations of settlement to the Court, and because of this Court's retrial of a major complex criminal litigation, now in its sixth trial week.[16]

Neither the press of time nor the usual "hydraulic pressure" of proposed settlements has caused the Court to shortcut its review and evaluation of the fairness, adequacy and reasonableness of the settlements. However, something had to give, and the "something" is the petitions for attorneys' fees. Those petitions will be decided forthwith.

Appropriate Orders will be issued.

### FINAL ORDER AND JUDGMENT

The Derivative Complaint (the "Complaint") in the Derivative Action was filed on April 14, 1992, by plaintiffs David M. Yeager and Sally Yeager ("Derivative Plaintiffs") against Defendants John G. Rangos, Sr.; John G. Rangos, Jr.; Alexander W. Rangos; Joseph G. Stotlemyer; Michael J. Peretto; Estate of Hugh Scott; William E. Moffett; John M. Arthur (collectively, "Chambers Defendants"); Richard A. Knight; Grant

---

**16.** *United States v. John F. "Duffy" Conley,* 911 F.Supp. 169 (W.D.Pa.1995).

Thornton LLP ("Grant"); and, nominal defendant Chambers Development Company, Inc. ("Chambers").

On February 24, 1995, Derivative Plaintiffs, Chambers Defendants and Chambers entered into a Derivative Action Stipulation and Settlement Agreement ("Chambers Defendants Derivative Settlement Agreement"). On March 17, 1995, Derivative Plaintiffs and Grant entered into a Derivative Action Stipulation and Settlement Agreement (the "Grant Thornton Derivative Settlement Agreement"). These two settlement agreements are referred to herein collectively as the "Settlement Agreements" and the settlements reached thereby are referred to herein collectively as "this Settlement."

On March 22, 1995, this Court entered an Order scheduling a hearing with respect to this Settlement ("Settlement Hearing") and requiring that Notice of that hearing be given to all shareholders of record as of March 17, 1995 ("Shareholders").

On May 17, 1995, with the consent of counsel for all parties, the plaintiffs in a certain derivative action pending at No. G.D. 93–3942 in the Court of Common Pleas of Allegheny County, Pennsylvania, and the plaintiffs in certain derivative actions consolidated and pending at Civil Action No. 12508 in the Court of Chancery of the State of Delaware in and for New Castle County, sought leave to intervene in the Derivative Action to join in and support the Settlement Agreements, and said motion has been granted by this Court.

The Settlement Hearing was held on May 19, 1995. Prior to the Settlement Hearing, proof of Notice to the Shareholders, as directed in the order scheduling the Settlement Hearing, was presented and filed. The Shareholders were given the opportunity to file objections and were also notified of their right to appear at the Settlement Hearing in support of, or in opposition to, the Settlement Agreements.

Capitalized terms used but not otherwise defined in this Order shall have the meanings ascribed to them in the Settlement Agreements.

The Court, having heard counsel on behalf of the parties and having reviewed the submissions presented with respect to the Settlement Agreements, and having determined that the Settlement Agreements are fair, adequate and reasonable to Chambers and were entered into in good faith, and good cause appearing therefor, it is hereby

NOW, THEREFORE, this 30th day of May, 1995, it is ordered that:

1. The Settlement Agreements are in all respects fair, adequate, reasonable and proper and in the best interests of Chambers and were entered into in good faith, and the Settlement Agreements are hereby both finally approved.

2. Notice to the Shareholders has been given in an adequate and sufficient manner.

3. This Court finds, for purposes of this Settlement, as stipulated by the parties, that Derivative Plaintiffs and the plaintiffs that have intervened in the Derivative Action are adequate representatives to prosecute the Derivative Action, that their counsel are competent for such purposes, and that the Claims in the Derivative Action are properly brought on behalf of Chambers under Rule 23.1 of the Federal Rules of Civil Procedure.

4. Derivative Plaintiffs, Chambers Defendants, Grant and Chambers shall consummate and fulfill their respective obligations under the Settlement Agreements in accordance with the terms of each thereof.

5. The Derivative Action is dismissed on the merits and with prejudice as to all defendants, without costs to any party.

6. Derivative Plaintiffs and the plaintiffs that have intervened in the Derivative Action, Chambers and Chambers' present and former shareholders are permanently barred and enjoined from instituting, maintaining, prosecuting or enforcing any other or further proceedings, whether brought directly, representatively, derivatively or in any other capacity, against the Chambers Defendants, Grant or any other Releasee consisting of, based on, arising from or related to any Claims; provided, however, that this order will not prevent Chambers or any of its officers, directors or employees from asserting any claim for set-off or counterclaim

against defendant Richard A. Knight or any other Chambers' Releasee who is not a Settling Defendant, in the event that they, or any of them, assert any claim or cause of action of any kind whatsoever against Chambers or any of its officers, directors or employees. "Chambers' Releasee" as used in this paragraph 6 means Chambers, Chambers' present and former officers, directors, agents, employees, attorneys, consultants, representatives, affiliates, subsidiaries, successors and assigns and the individual Chambers Defendants' heirs, administrators and executors.

7. All Non-Settling Persons (as defined below) and future defendants and third-party defendants are permanently barred and enjoined forever from filing or maintaining any and all Claims-Over in the nature of contribution or indemnity against the Chambers Defendants, Grant or any other Releasee. A "Non-Settling Person" is (a) any defendant that is or becomes a non-settling defendant because he or it is not a party to a settlement, or the settlement to which he or it is a party is either terminated or otherwise does not become finally effective, or (b) any other person or entity that asserts any Claims-Over against the Chambers Defendants, Grant or any other Releasee. This injunction and bar order applies to any form of action or attempted action, including without limitation, any claim by way of third-party or subsequent party complaint, collateral action, cross-claim, separate action or otherwise; provided, however, that this injunction and bar order: (a) shall not be construed to extend to claims in the nature of contribution or indemnity that are asserted in (i) the litigation styled as *Option Resource Group et al v. Chambers Development Company,* Civil Action No. 93–354 (W.D.Pa., filed Mar. 9, 1993), or (ii) in any litigation that is instituted by any member of the plaintiff class who or which duly excludes himself, herself or itself from that class in accordance with the procedures established by this Court; (b) shall not prevent defendant Richard A. Knight from asserting against Chambers or any of its officers, directors or employees any claim related to or arising from his employment with Chambers, including but not limited to, claims for compensation or other employee

benefits; claims arising from or related to Knight's purchase and ownership of Chambers stock; and claims for retirement or pension benefits; or, (c) shall not prevent any Releasee from asserting any enforceable claim for contribution, indemnity or defense costs which is provided for in a written contract or in Chambers' bylaws or other governing corporate documents. The method for calculating judgment reduction credits available to Non-Settling Persons in the event that judgments are obtained against one or more of the Non-Settling Persons is set forth in paragraph 8 below. Any action to enforce this paragraph may be brought in this Court.

8. The amount of any judgment otherwise obtained, derivatively on behalf of Chambers, by Derivative Plaintiffs or the plaintiffs that have intervened in the Derivative Action against any Non-Settling Persons in this or any other action in which Non-Settling persons have asserted any Claims-Over against the Chambers Defendants, Grant or any Releasee shall be reduced by the greater of:

(a) the total value of the settlement consideration paid by or on behalf of the Chambers Defendants and Grant under this Final Order and Judgment, exclusive of accrued interest; or

(b) an amount reflecting the proportionate responsibility, if any, of the Chambers Defendants and Grant as determined by the fact finder, for any judgment obtained derivatively on behalf of Chambers against any Non-Settling Persons.

The set-off method described herein will apply for all Non-Settling Persons.

9. With respect to any Claims-Over which are not barred pursuant to paragraph 7 of this Order, any judgment obtained, derivatively on behalf of Chambers, by Derivative Plaintiffs and the plaintiffs that have intervened in the Derivative Action against any Non-Settling Person consisting of, based on, arising from or related to any Claims, shall be automatically reduced in such manner as may be necessary to satisfy and/or extinguish any Claims-Over after all applicable appeals of such Claims-Over have been

exhausted. By way of illustration, if Derivative Plaintiffs or the plaintiffs that have intervened in the Derivative Action obtain a judgment, derivatively on behalf of Chambers, against any Non–Settling Person, and that person obtains a final judgment against the Chambers Defendants, Grant or any other Releasee for any Claims–Over, then Derivative Plaintiffs and/or the plaintiffs that have intervened in the Derivative Action will automatically reduce their final judgment against such Non–Settling Person by the amount the Chambers Defendants, Grant or any other Releasee is obligated to pay under the Claims–Over. Any funds obtained by Derivative Plaintiffs or the plaintiffs that have intervened in the Derivative Action pursuant to any judgment against a Non–Settling Person, or a settlement with a Non–Steeling Person, shall be placed and retained in escrow until either such Non–Settling Person shall execute and deliver an appropriate release to the Chambers Defendants, Grant and the other Releasees, or such Claims–Over are finally determined. Such escrowed funds shall first be used to reduce any judgment from any Claims–Over before they are distributed for any other purpose. In the event that any final judgment on any Claims–Over is entered against the Chambers Defendants, Grant or any other Releasee, after all applicable appeals of such Claims–Over have been exhausted, escrow funds in an amount necessary to satisfy such judgment shall be paid to satisfy such judgment. The provisions of Rule 23.1 will apply to any settlement with a Non–Settling Person, and any such settlement shall be reduced to judgment.

10. Chambers Defendants, through their insurance carrier, have paid TWO MILLION DOLLARS ($2,000,000), out of Chambers' Directors and Officers' Liability Insurance Policy, into an escrow account in accordance with paragraph 4 of the Chambers Defendants' Derivative Settlement Agreement and in accordance with the Chambers Defendants' Derivative Escrow Agreement attached as Exhibit D to the Chambers Defendants' Derivative Settlement Agreement. Grant Thornton has paid TWO HUNDRED THOUSAND DOLLARS ($200,000) in accordance with paragraph 3 of the Grant Thornton Derivative Settlement Agreement and in accordance with the Grant Thornton Derivative Escrow Agreement attached as Exhibit C to the Grant Thornton Derivative Settlement Agreement. These escrowed amounts shall be maintained, managed and disbursed in accordance with said escrow agreements.

11. Chambers shall continue to implement, for a period of at least two (2) years after the Settlement Effective Date, appropriate therapeutic measures, including appointment of an outside director who is a certified public accountant as Chairman of the Audit Committee of the Board of Directors, and having the Audit Committee report to the Board at least semi-annually concerning Chambers' accounting practices, provided that this obligation shall end on the effective date of any merger of Chambers into a publicly traded corporation.

12. Within ten (10) days after the Settlement Effective Date, Defendant John G. Rangos, Sr., shall transfer, or cause to be transferred, from Synergy Associates to Chambers that real estate owned by Synergy consisting of an approximately 7.018 acre improved site with an office building containing a gross floor space of approximately 55, 319 square feet, which is currently occupied by Chambers. The property is identified as Block and Lots Nos. 369–B–361 and 369–C–314 by the Allegheny County Assessment Office and is located at 10700 Frankstown Road, Penn Hills Township, Pennsylvania, and is described in an appraisal dated October 31, 1994, previously provided by Derivative Plaintiffs' counsel in these proceedings. The conveyance of said property is subject to the encumbrances described in that appraisal, including the balance due on the mortgage on said property held by the Allegheny County Industrial Development Authority, which as of March 17, 1995, was $1,960,000, which shall be assumed or discharged by Chambers.

13. Defendant John G. Rangos, Sr., shall provide a FIFTEEN MILLION DOLLAR ($15,000,000) personal guarantee in the form attached as Exhibit B to the Chambers Defendants' Derivative Settlement Agreement, to be issued by Defendant John G. Rangos,

Sr., with respect to payments to be made to settle the Securities Class Action in accordance with the terms of the Class Action Stipulation and Agreement of Compromise and Settlement concerning the Chambers Defendants.

14. Nothing herein will divert Chambers and its Board of Directors of their rights and duties under applicable law.

15. Without affecting the finality of this judgment, this Court shall retain jurisdiction over the Settlement Agreements and the parties thereto as to the matters related to the administration and consummation of this Settlement hereby approved and for payment of fees to plaintiffs' counsel.

16. In the event the Chambers Defendants' Derivative Settlement Agreement does not become effective in accordance with the terms hereof, this Final Order and Judgement shall be entered null and void and be vacated as to the parties and terms contained in the Chambers Defendants' Derivative Settlement Agreement, and the Chambers Defendants' Derivative Settlement Agreement and all orders entered in connection therewith (except for any bar order covering Grant and any other Releasee (as defined in the Grant Thornton Derivative Settlement Agreement)) shall be rendered null and void. This Final Order and Judgment as to Grant, the Grant Thornton derivative Settlement Agreement and all orders entered in connection therewith are final and unconditional with respect to Grant.

17. The Settlement Agreements are not an admission of the validity of any actions or claims which arise out of, directly or indirectly, or are in any way connected with the facts, circumstances, transactions or occurrences described in the Derivative Action or of any wrongdoing or violation of law. The Settlement Agreements are not a concession by the defendants and shall not be used as an admission of any fault by any party. The Settlement Agreements and any and all related documents shall not be offered or received in evidence in any civil, criminal or administrative action or proceeding other than such proceedings as may be necessary to consummate or enforce this Settlement.

18. This Court finds that there is no just reason for delay in entry of a final judgment and this Order shall constitute a final judgment in accordance with Rule 54(b) of the Federal Rules of Civil Procedure.

### FINAL JUDGMENT AND ORDER OF DISMISSAL AS TO ALL DEFENDANTS

This matter having come before the Court on motion for approval of a Class Action Stipulation and Agreement of Compromise and Settlement entered into on February 24, 1995, and the Supplement thereto dated March 20, 1995 (the "Chambers Supplement"), between the plaintiffs in the above-referenced action (the "Plaintiffs") and defendants Chambers Development Company, Inc. ("Chambers"), John G. Rangos, Sr., John G. Rangos, Jr., Alexander W. Rangos, Joseph G. Stotlemyer, Michael J. Peretto (listed as "Paretto" in the Amended Consolidated Class Action Complaint (the "Complaint")), Frank D. Hutchinson, Estate of Hugh Scott, William E. Moffett, John M. Arthur, John J. Cushma, and William R. Nelson (the "Chambers Defendants") (collectively, the "Chambers Stipulation"), and on motion for approval of a Class Action Stipulation and Agreement of Compromise and Settlement dated March 17, 1995, and the Amendment thereto dated March 20, 1995 (the "Grant Thornton Amendment"), between the Plaintiffs and defendants Grant Thornton LLP ("Grant"), Richard Stewart, David Abramson, Domenick Esposito and Charles Fallon, individually and on behalf of the defendant class of Grant partners named in the Complaint (the "Grant Thornton Settling Defendants") (collectively, the "Grant Stipulation"), in this consolidated class action (the "Action"), and the Court, having considered all papers filed and proceedings held in connection with said motions, having held a hearing on May 19, 1995 (the "Hearing"), notice of the Hearing having duly been given in accordance with the Court's Hearing Order dated March 22, 1995, and finding no just reason for delay in entry of this Final

Judgment and good cause appearing therefor:

NOW, THEREFORE, this 30th day of May, 1995,

**IT IS HEREBY ORDERED THAT:**

1. This Court has jurisdiction over the subject matter of this Action and over all parties to this Action, including all Members of the Class. The Class consists of all persons who between March 18, 1988 and October 20, 1992, both dates inclusive, purchased securities issued by Chambers (the "Class"). Excluded from the Class are each of the defendants, officers and directors of Chambers, members of the immediate family of each of the individual defendants, and affiliates of the corporate defendants, partners and partnership defendants.

2. This Court hereby approves (i) the settlement set forth in the Chambers Stipulation (the "Chambers Settlement"); and (ii) the settlement set forth in the Grant Stipulation (the "Grant Settlement") and finds that both the Chambers Settlement and the Grant Settlement are, in all respects, fair, reasonable and adequate to the Class.

3. This Court hereby finds and concludes that the notice given to the Class was in compliance with this Court's Order dated March 22, 1995 and that said notice was the best notice practicable under the circumstances and fully satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, including, but not limited to, the form of notice and methods of identifying and giving notice to the Class.

4. This Court hereby dismisses, on the merits and with prejudice, without costs to any party, other than those designated below, this Action in favor of each and all of the Chambers Defendants, Releasees, Underwriter Defendants and Underwriter Releasees (as those terms are defined in the Chambers Stipulation). Each and every Releasee and Underwriter Releasee is forever released and discharged from any and all of the "Claims" (as defined in the Chambers Stipulation).

5. This Court hereby dismisses, on the merits and with prejudice, without costs to any party, other than those designated below, this action in favor of Grant, Richard A. Knight, all of Grant's partners and employees, and all other Grant Releasees (as defined in the Grant Stipulation). Each and every Grant Releasee is forever released and discharged from any and all of the "Class Claims" (as defined in the Grant Stipulation).

6. Plaintiffs and each and every member of the Class (except members who have properly and timely requested exclusion) are permanently barred and enjoined from instituting, maintaining, prosecuting or enforcing, either directly, individually, representatively, or derivatively, any and all Claims against any of the Chambers Defendants, the Underwriter Defendants or any of the other Releasees or Underwriter Releasees mentioned in the Chambers Stipulation. Those persons appearing on the list annexed hereto, who have requested exclusion from the Class, shall not participate in the proceeds of the Chambers Settlement hereby approved nor receive any benefits thereunder.

7. Plaintiffs and each and every member of the Class (except putative members of the Class who have properly and timely requested exclusion) are permanently barred and enjoined from instituting, maintaining, prosecuting or enforcing any and all Class Claims, either directly, individually, representatively, or derivatively, against Grant, Richard A. Stewart, David H. Abramson, Domenick J. Esposito Charles R. Fallon, Richard A. Knight, all of Grant's partners and employees, and all other Grant Releasees (as those terms are defined in the Grant Stipulation). Those persons appearing on the list annexed hereto, who have requested exclusion from the Class, shall not participate in the proceeds of the Grant Settlement hereby approved nor receive any benefits thereunder.

8. The Chambers Stipulation and the Chambers Settlement described therein is not an admission of the validity of any actions or claims which arise out of, directly or indirectly, or are in any way connected with the facts, circumstances, transactions or oc-

currences described directly or indirectly in this Action, or of any wrongdoing, or of any violation of law; the Chambers Stipulation and the Chambers Settlement described therein is not a concession and neither shall be used as an admission of any fault or omission in any statement, release, or written document issued, filed, or made; and neither the Chambers Stipulation nor the Chambers Settlement described therein or any related document shall be offered or received in evidence in any civil, criminal, or administrative action or proceeding other than such proceedings as may be necessary to consummate or enforce the Chambers Stipulation and the Chambers Settlement described therein.

9. The Grant Stipulation and the Grant Settlement described therein are not an admission of the validity of any actions or claims which arise out of, directly or indirectly, or are in any way connected with the facts, circumstances, transactions or occurrences described directly or indirectly in this Action, or of any wrongdoing, or of any violation of law; the Grant Stipulation and the Grant Settlement described therein are not a concession and neither shall be used as an admission of any fault or omission in any statement, release, or written document issued, filed, or made; and neither the Grant Stipulation nor the Grant Settlement described therein or any related document shall be offered or received in evidence in any civil, criminal, or administrative action or proceeding other than such proceedings as may be necessary to consummate or enforce the Grant Stipulation and the Grant Settlement described therein.

10. Without affecting the finality of this judgment, the Court hereby reserves and retains continuing jurisdiction over all matters relating to the administration and effectuation of the terms of (i) the Chambers Stipulation and the Chambers Settlement embodied therein; and (ii) the Grant Stipulation and the Grant Settlement embodied therein.

11. In the event that the Chambers Settlement does not become effective in accordance with the terms of the Chambers Stipulation, then this judgment shall be rendered null and void and be vacated as to the parties and terms contained in the Chambers Stipulation, and the Chambers Stipulation and all orders entered in connection therewith (except for any bar order covering the Grant Thornton Settling Defendants) shall be rendered null and void.

12. This Final Judgment and Order of Dismissal as to the Grant Thornton Settling Defendants, the Grant Stipulation, and all orders entered in connection therewith are final and unconditional with respect to the Grant Thornton Settling Defendants.

13. Plaintiffs' Co–Lead Counsel shall take such reasonable steps as may be necessary to process the Proofs of Claim and otherwise bring about the consummation of the Chambers Settlement and the Grant Settlement, including the payment of the administration agent who receives and processes the Proofs of Claim.

## BAR ORDER WITH RESPECT TO CLAIMS BROUGHT AGAINST THE SETTLING DEFENDANTS

UPON review and consideration of (a) the Class Action Stipulation and Agreement of Compromise and Settlement, dated February 24, 1995, executed on behalf of the Plaintiffs in the above-referenced consolidated class actions ("Action") and defendants Chambers Development Company, Inc. ("Chambers"); John G. Rangos, Sr.; John G. Rangos, Jr.; Alexander W. Rangos; Joseph G. Stotlemyer; Michael J. Peretto (listed as "Paretto" in the Complaint); Frank D. Hutchinson; Estate of Hugh Scott; William E. Moffett; John M. Arthur; John J. Cushma; and William R. Nelson (collectively "Chambers Defendants") by their duly authorized counsel and the Supplement thereto dated March 20, 1995 executed on behalf of the Plaintiffs and Chambers with respect to the Plaintiffs' claims against the Underwriter Defendants as therein defined (the February 24, 1995 Stipulation and the March 20, 1995 Supplement are referred to herein as the "Cham-

bers Stipulation"); and (b) the Class Action Stipulation and Agreement of Compromise and Settlement, dated March 17, 1995, and Amendment thereto, dated March 20, 1995, executed on behalf of the Plaintiffs in the Action and defendants Grant Thornton, Richard A. Stewart, David H. Abramson, Domenick J. Esposito, and Charles R. Fallon (collectively, the "Grant Thornton Defendants") by their duly authorized counsel ("Grant Thornton Defendants' Stipulation"); and UPON consideration of all prior proceedings in the Action; and

UPON consideration of the aforesaid Stipulations which would have the effect of settling and dismissing the Action upon the terms and conditions set forth therein (the "Settlement"); and

UPON consideration of the Final Judgment and Order of Dismissal entered by this Court;

1. The following additional definitions shall apply in this Order:

a) "Non–Settling Person" means (i) any defendant that is or becomes a non-settling defendant because the claims against such defendant are not the subject of the Chambers Stipulation or the Grant Thornton Defendants' Stipulation or because the Stipulation to which that defendant is a party or a beneficiary is either terminated or otherwise does not become finally effective or (ii) any future defendant or third-party defendant or other person or entity that asserts any Claims–Over against the Settling Defendants or Releasees;

b) "Releasees" means, (i) in the event the Chambers Stipulation is approved by the Court and becomes finally effective, (a) each of the Chambers Settling Defendants, Chambers' present and former officers, directors, agents, employees, attorneys, consultants, representatives, affiliates, subsidiaries, successors and assigns, and the individual Chambers Settling Defendants' heirs, administrators and executors, and (b) each of the Underwriter Releasees as defined in paragraph 1 of the Supplement; (ii) in the event the Grant Thornton Defendants' Stipulation is approved by the Court and becomes finally effective, each of the Grant Settling Defendants, Grant Thornton's present and former partners, principals, agents, employees, attorneys, consultants, representatives, affiliates, insurers, predecessors, successors and assigns, and the heirs, administrators and executors and/or successors and assigns thereof; (iii)(a) in the event that only the Chambers Stipulation is approved by the Court and becomes finally effective, Richard A. Knight shall be a Releasee solely as to the period of time during which he was an officer of Chambers and solely as to those acts performed as an officer, director or employee, on behalf of Chambers only; and (b) in the event that only the Grant Thornton Defendants' Stipulation is approved or both Stipulations are approved, Richard A. Knight shall be a Releasee.

c) "Settling Defendant" means any defendant with respect to whom the Settlement is approved by the Court and also becomes finally effective in accordance with the terms of the Stipulations.

d) "Stipulations" means the Chambers Stipulation and the Grant Thornton Defendants' Stipulation, as those terms are defined above.

e) "Claims–Over" means any action, claim or proceeding which is or may be brought against any Releasee either in the Action or in a separate proceeding by any claimant in which the claimant seeks recovery from any Releasee in the nature of contribution, indemnity or otherwise for all or some portion of any judgment or settlement that Plaintiffs or any Member may obtain against the claimant in respect of or for any Claims as defined in the Chambers Stipulation.

f) All capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Stipulations.

2. All Non–Settling Persons are permanently barred and enjoined forever from filing or maintaining any and all Claims–Over, subject to the limitations in paragraphs 3 and 4 below. This injunction and bar order applies to any form of action including without limitation any claim by way of third-party or subsequent party complaint, collateral action, cross-claim, separate action or otherwise; provided, however, that this Order shall not extend to bar any claims in the nature of contribution or indemnity that any of the defendants in the Action have asserted, or in the future may assert, against one another (a) in the litigation styled as *Option Resource Group et al. v. Chambers Development Company*, Civil Action No. 93–354 (W.D.Pa. filed Mar. 9, 1993), or (b) in any litigation that is instituted by any member of the plaintiff class in the Action who or which duly excludes himself, herself or itself from that class in accordance with the procedures established by the Court. The method for calculating judgment reduction credits available to Non–Settling Persons in the event that Plaintiffs or any Members obtain any judgments against one or more of the Non–Settling Persons is set forth below in paragraph 5. Any action or proceeding to enforce this Order may be brought in this Court.

3a) This Order does not prevent Chambers or any of its officers, directors, or employees from asserting any set-off or counterclaim against Richard A. Knight or any other Releasee who is not a Settling Defendant, in the event that they, or any of them, assert any claim or cause of action of any kind whatsoever against Chambers or any of its officers, directors, or employees.

b) This Order does not prevent Richard A. Knight from asserting against Chambers or any of its officers, directors, or employees any claim related to or arising from his employment with Chambers, including but not limited to, claims for compensation or other employee benefits; claims arising from or related to Knight's purchase and ownership of Chambers stock; and claims for retirement or pension benefits.

4. This Order will not prevent any Releasee from asserting any enforceable claim for contribution, indemnity or defense costs which is provided for in a written contract or in Chambers' bylaws or other governing corporate documents.

5. The amount of any judgment otherwise obtained by any Plaintiff or Member against any Non–Settling Person in this or any other action in which Non–Settling Persons assert any Claims–Over against any Settling Defendants (or could have asserted such claims but for this Order), shall be reduced by the greater of:

a) the total value of the settlement consideration paid by the Settling Defendants this Action, exclusive of accrued interest; or

b) an amount reflecting all Settling Defendants' collective proportionate responsibility, if any, as determined by the fact-finder, for any damages obtained by any Plaintiff or Member against any Non–Settling Person for claims or causes of action consisting of, based on, arising from or related to any Claims.

Thus, by way of illustration, if the trier of fact would determine at trial that the total loss to the Plaintiff Class is $20 million ($20,000,000.00) and that the Settling Defendants are collectively forty percent (40%) liable under the doctrine of proportionate fault and the Non–Settling Persons are collectively sixty percent (60%) liable, then Plaintiff Class' judgment against the Non–Settling Persons shall be reduced by the greater of (a) the total value of the settlement consideration or (b) $8 million ($8,000,000.00).

The judgment reduction method described herein will apply for all Non–Settling Persons.

This Court finds that there is no just reason for delay in entry of a final judgment, and this order shall constitute a final judgment in accordance with Rule 54(b) of the Federal Rules of Civil Procedure.

## LIST OF OPT–OUTS IN CHAMBERS DEVELOPMENT COMPANY SECURITIES LITIGATION

| Name and Address | Number of Shares |
|---|---|
| 1. Option Resources Group c/o Richard N. Bell Cohen & Malad, P.C. 136 N. Delaware Indianapolis, IN 46204–0627 | Not Given |
| 2. Joseph S. Oswald 2759 Liberty Street Trenton, NJ 08629 | 100 |
| 3. Frank E. Williams 1 Lincoln Heights Buckhannon, WV 26201 | Not Given |
| 4. David M. Boyd Pineview Drive, RD–1 Palmyra, PA 17078 | 100 |
| 5. William K. Waggener 13223 North 109th Avenue Sun City, AZ 85351–2505 | 100 |
| 6. Douglas Rittenberry P.O. Box 248 Canyon, TX 79015 | 10 |
| 7. Vernon W. Underwood 5966 Murdock Avenue Bethel Park, PA 15102 | 600 |
| 8. Evelyn Noren 3215 East David Lane Winnemucca, NV 89445 | 100 |
| 9. Katherine Kurtz—Virginia Hoyt c/o Michelle Jamison The Boston Co. One Boston Place Boston, MA 02108 | 200 |
| 10. UFCW Local 1262 c/o Michelle Jamison The Boston Co. One Boston Place Boston, MA 02108 | 2,840 |
| 11. Walter L. Sanders John Norton McMillan, Sr. McMillan & Sanders, Inc. 1315 Garner Lane Jamestown Square Suite 106 Columbia, SC 20210 | Not Given |
| Name and Address | Number of Shares |
| 12. Fred A. Moran Moran Family Moran & Associates, Inc. Securities Brokerage 25 Doubling Road Greenwich, CT 06830–4845 | 483,600 |